**STATE OF NORTH CAROLINA;** Duke University; The Durham Chamber of Commerce, Incorporated; Research Triangle Institute; Erwin Mills, Inc.; and Mary Trent Semans, Plaintiffs,

v.

**UNITED STATES** of America; Interstate Commerce Commission; and Southern Railway Company, Defendants.

No. C-158-D-62.

United States District Court
M. D. North Carolina,
Durham Division.

Oct. 19, 1962.

H. Neil Garson, Washington, D. C., and William H. Murdock, Dist. Atty., for the United States.

H. Neil Garson, Washington, D. C., for Interstate Commerce Commission.

Joyner & Howison, Raleigh, N. C., Major L. P. McLendon, Greensboro, N. C., James A. Bistline, Washington, D. C., and Earl E. Eisenhart, Jr., Washington, D. C., for Southern Ry. Co.

Before BELL, Circuit Judge, and CRAVEN and PREYER, District Judges.

PREYER, District Judge.

This is an action brought under Title 28 U.S.C. § 1336, in accordance with Title 28 U.S.C. §§ 1938, 2284 and 2321–2325. Its purpose is to set aside and enjoin enforcement of an order of the ICC granting Southern Railway Co. the right to discontinue all remaining passenger service between Greensboro, N. C. and Goldsboro, N. C. Acting under Title 49 U.S.C. § 13a(2) [1], the Commission found that (1) the present or future public convenience and necessity permit such discontinuance, and (2) continuance of the operation would constitute an unjust and undue burden on interstate operations of the carrier and upon interstate commerce.

On July 18, 1959, Southern Railway Company filed a petition with the North Carolina Utilities Commission for discontinuance of its trains Nos. 13 and 16 which are the last passenger trains op-

Thomas Wade Bruton and Charles W. Barbee, Raleigh, N. C., for State of North Carolina.

E. C. Bryson, Durham, N. C., for Duke University.

F. Gordon Battle and Victor S. Bryant, Durham, N. C., for Durham Chamber of Commerce and Research Triangle.

A. H. Graham, Jr., Durham, N. C., for Erwin Mills.

E. C. Brooks, Jr., Durham, N. C., for Mary Trent Semans.

1. Section 13a(2) provides that:

"Where the discontinuance or change, in whole or in part, by a carrier or carriers subject to this chapter, of the operation or service of any train or ferry operated wholly within the boundaries of a single State is prohibited by the constitution or statutes of any State or where the State authority having jurisdiction thereof shall have denied an application or petition duly filed with it by said carrier or carriers for authority to discontinue or change, in whole or in part, the operation or service of any such train or ferry or shall not have acted finally on such an application or petition within one hundred and twenty days from the presentation thereof, such carrier or carriers may petition the Commission for authority to effect such discontinuance or change. * * * When any petition shall be filed with the Commission under the provisions of this paragraph the Commission shall notify the Governor of the State in which such train or ferry is operated at least thirty days in advance of the hearing provided for in this paragraph, and such hearing shall be held by the Commission in the State in which such train or ferry is operated; and the Commission is authorized to avail itself of the cooperation, services, records and facilities of the authorities in such state in the performance of its functions under this paragraph."

erating between Goldsboro and Greensboro, North Carolina. Actually, only one train is involved, it being designated No. 16 in one direction and No. 13 on the return trip.

Train No. 16 leaves Greensboro daily at 6:10 a. m., makes twelve regular stops and arrives in Goldsboro at 10:45 a. m. Its principal stops are Burlington, Durham, Raleigh, and Selma.

Train No. 13 leaves Goldsboro daily at 4:05 p. m. and arrives in Greensboro at 8:50 p. m. with similar stops along the route.

A sleeping car is attached to the train and by connection with other trains at Greensboro there is service to and from Washington, New York, and other major centers along the Eastern Seaboard.

These trains carry express but no freight or mail. The coaches have a capacity of 80 passengers. In addition, there is a 6 bedroom, ten-roomette sleeping car. There are six employees paid by the railroad servicing the train.

After. hearings, the State Commission denied the application. Southern appealed to the North Carolina Superior Court, which affirmed the decision, and then to the Supreme Court of North Carolina which also affirmed. State ex rel. Utilities Comm. v. Southern R. R. Co., 254 N.C. 73, 118 S.E.2d 21 (1961).

On April 16, 1962, Southern filed a petition with the Interstate Commerce Commission under Section 13a(2) of the Interstate Commerce Act, again seeking authority to discontinue the trains. The State of North Carolina and the other protestants were allowed to intervene.

The entire records of the hearings before the North Carolina State Utilities Commission, the North Carolina Superior Court, and the North Carolina Supreme Court were made a part of the record for consideration by the Interstate Commerce Commission.

The proceedings were referred to an ICC Examiner who, after holding hearings, recommended that the discontinuance be allowed. On July 2, 1962, Division 3 of the ICC issued an Order adopting the findings and conclusions of the Examiner and authorizing the discontinuance of the trains. A petition for reconsideration was denied by the ICC. This action followed.

## ISSUES DISMISSED

At the threshold of the case, plaintiffs raise certain legal questions which, if meritorious, would require dismissal of the ICC Order without reaching the substantive aspects of the case. Specifically, plaintiffs attack the constitutionality of section 13a(2); they claim a defect in the giving of notice of the discontinuance, as required by law; they contend that a lease from the North Carolina Railroad Corporation to the Southern Railway Company requires the continuance of these operations; and they claim that the decision of the North Carolina Supreme Court is res judicata on the issues, and that the ICC cannot make a contrary determination without a showing of changes in the surrounding circumstances that occurred after the North Carolina Supreme Court decision. We think all of these arguments are without merit.

■ Plaintiffs' attack on the constitutionality of section 13a(2) is without merit. The scope of the commerce power is such that there is little room for doubt of the constitutionality of an act allowing the ICC to eliminate intrastate operations that adversely affect interstate commerce. Gibbons v. Ogden, 9 Wheat. 1, 22 U.S. 1, 6 L.Ed. 23 (1824); Wickard v. Filburn, 317 U.S. 111 (118), 63 S.Ct. 82, 87 L.Ed. 122 (1942); Wisconsin R. R. Comm. v. Chicago, Burlington and Quincy R. R. Co., 257 U.S. 563, 589–590, 42 S.Ct. 232, 66 L.Ed. 371 (1922); Colorado v. United States, 271 U.S. 153, 163, 165–166, 46 S.Ct. 452, 70 L.Ed. 878 (1926). We find section 13a (2) constitutional.

As to plaintiffs' claim of a defect in notice, it is clear that the claim is based on an oversight by the ICC in failing to change a reference in 49 CFR 43.6 when 49 CFR 43.5 was amended and renumbered. Section 13a(2) merely re-

quires that the ICC notify the Governor of the state in which the train is operating. No further notice is required under section 13a(2) or under the commission regulations. We find that all requirements pertaining to notice have been met.

■ Plaintiffs further allege that the discontinuance of the trains in question would constitute a breach of the Lease Agreement between the Southern Railway Company and the North Carolina Railroad Company, dated August 16, 1895, and, consequently, that it is unlawful for the ICC to authorize such discontinuance. But no obligation to require the Southern to operate passenger trains over the lines leased from the North Carolina Railroad can be unambiguously spelled out of the lease. Furthermore, this issue was not raised before the ICC, and it should not be raised here for the first time. Carolina Scenic Coach Lines v. United States et al., 56 F.Supp. 801, 803–804 (W.D.N.C.1944); Unemployment Compensation Comm. of Territory of Alaska v. Aragon, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946); Davis Administrative Law Treatise, Section 20.06. Besides, the paramount power of Congress to regulate interstate commerce forces even express charter or lease provisions to give way before it. This has been held many times and is no longer in question. Colorado v. United States, 271 U.S. 153, 165–166, 46 S.Ct. 452, 70 L.Ed. 878 (1926); Texas v. United States, 292 U.S. 522, 531, 54 S.Ct. 819, 78 L.Ed. 1402 (1934); Moeller v. Interstate Commerce Commission, 201 F.Supp. 583 (S.D.Iowa, 1962); Burke County, Georgia v. United States, 206 F.Supp. 586 (S.D.Georgia, 1962).

■ Plaintiffs also seek to invoke the doctrine of res judicata to bar the ICC from considering the question of public convenience and necessity, alleging that this issue has been determined by the North Carolina Supreme Court in State ex rel. Utilities Comm. v. Southern Railway Company, 254 N.C. 73, 118 S.E.2d 21 (1961). This position cannot be sustained. Res judicata is a common law device to prevent litigation of matters already litigated between the same parties or those in privity with them. United States v. California Bridge & Construction Co., 245 U.S. 337, 341, 38 S.Ct. 91, 62 L.Ed. 332 (1917). It is clear that a statute may change this common law rule. The statute before us, section 13a(2), provides "* * * [W]here the State authority having jurisdiction thereof shall have denied an application * * * for authority to discontinue * * *, [the] carrier * * * may petition the [Interstate Commerce] Commission for authority * * * the Commission may grant such authority only after a full hearing and upon findings by it * * *." Since the statute requires the ICC to hold full hearings and to make findings, after a state decision, it seems quite clear that Congress did not intend for the state hearing to have res judicata effect. Cf. Sprague v. Woll, 7 Cir., 122 F.2d 128 (1941); N. L. R. B. v. Pacific Intermountain Express Co., 8 Cir., 228 F.2d 170, 176 (1956). This interpretation is reinforced by the legislative history of section 13a(2) which shows that Congress was motivated by a belief that State authorities were unduly regressive in that they often required continuance of uneconomic and unnecessary service. (S. Rep. No. 1647, 85th Cong., 2d Sess. (1958), pp. 21–22, H.R.Rep. No. 1922, 85th Cong., 2d Sess. (1958), pp. 11–12), U.S.Code Cong. and Adm.News 1958, p. 3456. The conclusion follows that Congress did not intend the ICC to give State determinations res judicata or collateral estoppel effect.

We proceed to the substantive issue in the case.

## ISSUES INVOLVED

The central issue in the case is whether the order of the ICC authorizing discontinuance of the two trains is warranted in law and is supported by adequate findings based on substantial evidence of record.

■ Judicial review of an order of the ICC is limited. We may not set aside

the ultimate findings of the Commission unless they are unsupported by substantial evidence on the record considered as a whole, involve error of law, or are arbitrary or capricious or constitute an abuse of discretion. Administrative Procedure Act, § 10(e), 5 U.S.C.A. § 1009(e); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950); Carolina Scenic Coach Lines v. United States, 56 F.Supp. 801, 804 (W.D.N.C.1944), aff'd 323 U.S. 678, 65 S.Ct. 277, 89 L.Ed. 550 (1944). It is not the function of this court to appraise the conflicting testimony or other evidence, to judge the credibility of witnesses and to determine the weight of the evidence. A court "cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Commission's judgment upon matters committed to its determination, if that has support in the record and the applicable law." United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946). But the order must be reversed if the Commission in arriving at its determination departed from the applicable rules of law and if its finding was arbitrary and capricious and had no basis in substantial evidence on the record as a whole.

Plaintiffs contend that the conclusions of the Commission must fall because made under a mistake of law. Specifically, they argue that the Commission's conclusion that the continued operations would constitute "an unjust and undue burden upon the interstate operations of Southern Railroad and upon interstate commerce" was made without considering the over-all prosperity of the carrier and the total operations of the carrier on the line involved, and that in such failure lies error. We think plaintiffs' position is well-taken.

As a matter of law, we think that the ICC cannot be said to have made a proper finding unless it takes into account the profits that the Southern

Railway makes in its freight operations on the same intrastate line. Chicago, M., St. P. & P. R. Co. v. Illinois, 355 U.S. 300, 78 S.Ct. 304, 2 L.Ed.2d 292 (1958); Public Service Commission of Utah v. United States, 356 U.S. 421, 78 S.Ct. 796, 2 L.Ed.2d 886 (1958). Unless this is taken into account, the full weight of the burden placed upon interstate commerce by these intrastate operations cannot be determined. Chicago and Utah cases, supra. At the time of the decision of the Supreme Court in Chicago, M., St. P. & P. R. Co. v. Illinois, supra, Title 49 U.S.C. § 13(4) provided that the ICC could change intrastate railway rates where they discriminated against interstate commerce in favor of intrastate commerce. The Supreme Court in the Chicago case held that the true nature of the burden on interstate commerce caused by discriminatory rates could not be assessed unless the other revenues in that state were taken into account. As stated by the Supreme Court (355 U.S. p. 305, 78 S.Ct. p. 308): "the occasion for the exercise of the federal power asserted by section 13(4) is the necessity for effecting the required contribution by intrastate traffic of its proportionate share of the revenues necessary to pay a carrier's operating costs and yield a fair return." In order to determine the burdens on interstate commerce caused by an intrastate loss, it is necessary to take into account intrastate profits. Cf. North Carolina v. United States, 325 U.S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760 (1945).

If losses in an intrastate operation are so exceeded by profits of intrastate operation of the same general type in the same state, so as to pay operating expenses and yield a high profit, the net effect on interstate operations is not a burden on interstate commerce. If the ICC is then to cut off all of the intrastate operations that suffer a loss, while retaining all others, the result would be to require the intrastate operations to bear more than their share. The intent of Congress was to prevent burdens on interstate commerce, not require tribute therefor.

It must be remembered that the state has a legitimate interest in intrastate commerce—"intrastate rates are primarily the State's concern and federal power is dominant 'only so far as necessary to alter rates which injuriously affect interstate transportation.' North Carolina v. United States, [supra] 325 U.S. 507, 511 [65 S.Ct. 1260]. * * * [justification for the exercise of this exceptional federal power] must 'clearly appear,' " Chicago, M., St. P. & P. R. Co., supra. To find that segment of intrastate operations represents an ultimate "burden" upon interstate commerce without reference to the question of whether intrastate operations generally on the same line make it such a burden might permit the entire field of intrastate operations to be federally arrogated by a separate treatment of segments unrelated to the net or total effects.

The Chicago and the Utah cases cited above are rate and revenue cases brought under section 13(4) rather than discontinuance cases under section 13a (2). It is clear, however, that section 13(4) cases furnish analogous authority for section 13a(2) cases. The "unjust and undue burden" standard contained in section 13a(2) derives from section 13 (4) of the Act and from judicial decisions relating to the power of the Commission to prescribe intrastate rates which impose an unjust or undue burden on interstate commerce. In section 13a (2) Congress also intended to prevent burdens on interstate commerce by intrastate operations that do not bear their full share of costs and profit. S.Rep. No. 1647, 85th Cong., 2d Sess. (1958), pp. 21–22; H.R.Rep. No. 1922, 85th Cong., 2d Sess. (1958) pp. 11–12. Indeed, section 13a(2) cases stand in an a fortiori relationship to section 13(4) cases. For to allow passenger service to be abandoned, in this case altogether, as contrasted to raising passenger fares, involves a far more serious incursion upon the traditional rights of the states. See Southern Railroad Co. v. South Carolina Public Service Commission et al., 31 F.Supp. 707, 710 (E.D.S.C.1940).

But defendants contend that the authority of the Chicago and the Utah cases cited above has been vitiated by the amendment to section 13(4), 72 Stat. 570, Pub.L. 85–625 section 4, an amendment which was keyed directly to these cases. The amendment was enacted on August 12, 1958; Chicago was handed down in January of 1958 and Utah in May of 1958. Section 13(4) was amended to allow the ICC to make a determination that intrastate railway rates discriminated against interstate commerce "without a separation of interstate and intrastate property, revenues, and expenses, and without considering in totality the operations or results thereof of any carrier * * * wholly within any State."[2]

In our opinion, the amendment to section 13(4) does not overturn the existing law applicable to discontinuance cases. Section 13a(2) was enacted at the same time that section 13(4) was amended. At that time, the purpose of amending

---

2. Section 13(4) was amended by the addition of the underlined portions:

"§ 13, par. (4). Duty of Commission where State regulations result in discrimination. Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice caused any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against, *or undue burden on,* interstate or foreign commerce *(which the Commission may find without a separation of interstate and intrastate property, revenues, and expenses, and without considering in totality the operations or results thereof of any carrier, or group or groups of carriers wholly within any State),* which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, discrimination, *or burden * * * "*.*

section 13(4) was fresh in the minds of Congress. If Congress had decided not to require the ICC to take into account the net result of the total operations of the intrastate lines in discontinuance cases as well as rate and revenue cases, it would have been easy to have amended proposed section 13a(2) just as section 13(4) was amended. This was not done.[3]

In any event, all that the major addition to section 13(4) does is to provide that the ICC may make their determination "without a separation of interstate and intrastate property, revenues, and expenses, and without considering in totality the operations or results thereof of any carrier * * * wholly within any State." This seems to mean that the Commission may decide without having to look into the above matter. However, where, as in this case, the matter was presented to the ICC, it would not seem likely that Congress intended the ICC to ignore these factors. The new provision indicates that the ICC may make a decision under section 13 (4) without considering the totality of intrastate operations when the facts as to totality of intrastate operations have not been presented to the Commission by the parties. However, where they are presented, they should be taken into account. The permissive phraseology of the section would appear to us to mean that a decision of the Commission will not be upset simply because it fails to find specifically these facts where they have not been put in issue by the evidence before the Commission, but this does not mean that such facts where relevant and pertinent are not to be considered.[4]

This interpretation of the amendment to section 13(4) is the one adopted by the courts. In Utah Citizens Rate Association v. United States, 192 F.Supp. 12, at p. 18 (D. Utah 1961), the three judge

---

3. It has been argued that since Congress amended section 13(4) to add the words "undue burden", and at the same time enacted section 13a(2) using the words "undue burden", Congress intended that the new provisions of section 13(4) were to be applied to section 13a(2). In other words, the argument is that the new addition to section 13(4) became a definition of "undue burden". However, it would appear more likely that the major amendment to section 13(4) was a grant of additional power to the ICC in applying section 13(4), rather than a new definition of "undue burden."

4. Another possible interpretation of the amendment is that it allows the ICC to make a change in rates without considering the overall statewide totality of a carrier's results—i. e. without considering *all* rates within a state—but does not mean that the totality of operations on the particular line in question should not be considered. See Conf. Report, Administrative News, 85th Cong.2d Sess., at pp. 3484–3485:
 "The amendment (to section 13(4)) deals only with the nature of the evidence to support such a finding. By two recent decisions of the Supreme Court (Chicago, Milwaukee, St. Paul and Pacific Railroad Co. v. State of Illinois (January 13, 1958), 355 U.S. 300, [78 S.Ct. 304, 2 L. Ed.2d 292], 356 U.S. 906, 78 S.Ct. 304,

665 [2 L.Ed.2d 573], and Public Service Commission of Utah v. United States (May 19, 1958), 356 U.S. 421, 78 S.Ct. 796, 2 L.Ed.2d 886), the Commission is required to consider the entire State operation, freight and passenger, in determining whether or not the intrastate freight rates were causing an undue revenue discrimination against interstate commerce. If the holdings in these cases mean that the required finding of—
 "undue, unreasonable, or unjust discrimination against,
 "or undue burden on, interstate or foreign commerce—
 "can be made only in the light of the overall statewide totality of a carrier's operating results derived from its entire body of rates applicable within the State, it would preclude the Commission from making such a finding on a showing of only the effect of the particular rate or rates in question. The Commission could not, under such an interpretation, continue to function effectively in removing unjust discrimination against interstate commerce caused by interstate rates and charges. * * * The above three amendments to paragraph (4) of section 13 do not vest the Commission with jurisdiction that it does not have today but deal with procedures in the exercise of that jurisdiction better to strengthen the protection of interstate commerce as designed in this provision of the act."

court stated that "We believe that a matter of procedure rather than any substantive change in the basic transportation policy of the Congress is involved [in the amendment]. If this were not so, serious conceptual and constitutional, and further practical difficulties, would be invited. * * * The legislative history of the amendment bolsters this view." Utah was affirmed per curiam in 365 U.S. 649, 81 S.Ct. 834, 5 L.Ed. 2d 857 (1961).

It would, therefore, appear that when making a determination under section 13a(2) to discontinue one type of service on a line, where such facts are pertinent and relevant, and especially when such facts are before the Commission, the ICC must take into account the revenues from all services on the line. Without taking this into account, an interference of this nature into the completely intrastate affairs of any state based upon the burden that state has placed upon interstate commerce cannot be supported.

Both the Trial Examiner's Report and the decision of the ICC below indicate that they did not take this factor into account. The following appears at pages 11 and 12 of the Examiner's Report:

> "At the hearing, protestants emphasized the fact that petitioner's net railway operating income in 1960 was $36,107,699, and that its net income alone from freight operations on the line between Greensboro and Goldsboro averages $630,-000, thus contending that the overall prosperity of the petitioner, as well as its intrastate freight operations, must be given effect in the disposition of the issues involved herein. With these contentions, the examiner disagrees."

On appeal, Division 3 of the ICC followed the Examiner's position (at pp. 4, 5):

> "But, interveners argue, petitioner's net income from freight traffic over the line is such that over-all

profitable operations result therefrom. It is their contention therefore, that the operation between Greensboro and Goldsboro cannot be held to be a burden upon interstate commerce. Their conclusion is that any application of section 13a(2) to a situation where an overall profitable operation is held to be a burden on interstate commerce results in an unconstitutional application of the provisions of the statute. In short, interveners allege that petitioner's net income from its freight operations over the line must be given effect when considering whether the continued operation of its passenger trains Nos. 13 and 16 will constitute a burden on interstate commerce. We think that such premise is contrary to the intent of Congress under the statute here involved. By analogy, interveners' view would require a determination that overall losses have resulted on traffic handled over the line. In that instance, however, petitioner could obtain adequate relief under the abandonment provisions of section 1(18) of the Act."

The ICC then states the rule to be as follows (p. 5):[5]

> "Nowhere in section 13a(2) or elsewhere in the law is there any requirement that the prosperity of the intrastate operations of the carrier as a whole, or any particular segment thereof, must be given effect in determining whether the operation of an individual intrastate train imposed an unjust and undue burden on interstate commerce. To hold otherwise would be contrary to the apparent intent of the Congress."

 The examiner and the ICC have misconstrued the intent of Congress and the contentions of the plaintiffs, as well as the applicable law. It is a non-sequitur to say that "by analogy, interveners' plaintiffs view would require a

---

5. Quoting from Southern Pacific Co.—Partial Discontinuance of Passenger Trains, Los Angeles, etc., 312 ICC 631.

determination that overall losses have resulted on traffic handled over the line." Plaintiffs do not contend—and it is not the law—that there can be no discontinuance unless freight·and passenger service considered together show a net loss. Rather, plaintiffs' contention is that the $630,000 freight profit is a factor to be considered in determining whether the $90,000 passenger loss on the same line constitutes an unjust and undue burden on interstate commerce. Whether there is a net profit or net loss is not necessarily the controlling factor, but the amount of the net profit or net loss is a factor to be considered. Whether the operation of the passenger service is a burden on interstate commerce and whether there is any longer a public need sufficient to justify the financial losses involved are questions not susceptible of scientific measurement or exact formulae but are questions of degree and involve the balancing of conflicting interests. All material factors bearing on the questions must be taken into account, the ICC must consider a fair picture.[6] Because Congress has expressed concern over the financial conditions of railway passenger service does not justify a reading of their intent to mean that if a segment of passenger service shows a loss, it is unnecessary to consider all other relevant factors, including the freight profits on the same line, to determine whether the loss constitutes a burden on interstate commerce.[7]

■ We hold, then, that the Commission should have considered the relative amount of profit on one service and loss on the other in making its finding of whether the passenger service here involved constituted an undue burden on interstate commerce.

## SUBSTANTIAL EVIDENCE ON THE RECORD

In order to allow discontinuance under section 13a(2) the Commission must find, based on substantial evidence on the record as a whole, that (a) the present or future public convenience and necessity permit of such discontinuance, and (b) the continued operation or service without discontinuance in whole or in part, will constitute an unjust and undue burden upon the interstate operation of such carrier or upon interstate commerce. Title 49 U.S.C. § 13a(2).

The use of the words "undue" and "unjust" must mean that there are permissible burdens, that is, "due" and "just" burdens. There is an interrelation between findings (a) and (b). To make a determination, the Commission must weigh the public convenience and necessity against the burdens.

What then is the public convenience and necessity to be served by this railroad.

6. See Colorado v. United States, 271 U.S. 153, 168–169, 46 S.Ct. 452, 456, 70 L.Ed. 878, 885, (Brandeis, J): "In many cases, it is clear that the extent of the whole traffic, the degree of dependence of the communities directly affected upon the particular means of transportation, and other attendant conditions, are such that the carrier may not justly be required to continue to bear the financial loss necessarily entailed by operation. In some cases, although the volume of the whole traffic is small, the question is whether abandonment may justly be permitted, in view of the fact that it would subject the communities directly affected to serious injury while continued operation would impose a relatively light burden upon a prosperous carrier. The problem and the process are substantially the same in these cases as where the conflict is between the needs of intrastate and of interstate commerce. Whatever the precise nature of these conflicting needs, the determination is made upon a balancing of the respective interests—the effort being to decide what fairness to all concerned demands. In that balancing the fact of demonstrated prejudice to interstate commerce and the absence of earnings adequate to afford reasonable compensation are, of course, relevant and may often be controlling. But the Act does not make issuance of the certificate dependent upon a specific finding to that effect."

7. All relevant factors are considered in fixing freight rates. Southern has received six increases in freight rates since 1951, in all of which the size of passenger deficits were taken into account. ICC Record, Vol. 11, pp. 197–200.

The record discloses that the two trains in question are the last remaining east-west passenger trains between Goldsboro and Greensboro, North Carolina. Until September 1954 Southern operated three pairs of passenger trains on this line. One pair of trains was discontinued in 1954 and another pair in 1958 which reduced the passenger service to trains Nos. 13 and 16 which are involved in this proceeding. The principal public convenience presently afforded by these trains arises from the interconnecting service at Greensboro with north-south trains on Southern's main line. The pullman service furnishes convenient overnight travel to New York and other East Coast cities, allowing a full working day to the traveler and thus conserving work time. A number of witnesses pointed out the superior convenience of this service to travel by air.

The City of Durham has the largest natural interest in the use of the trains, 46% of the passengers embarking or leaving the trains there. This city has a population of 78,302. A witness for the railroad could recall only five cities in the United States with a population in excess of 70,000 that are without rail passenger service. The discontinuance of these trains would leave Durham County (1960 population 111,995), Alamance County (1960 population 85,674), and Orange County (1960 population 42,970) without any rail passenger service.[8] These three counties with a total population of 240,639 are located in the industrial Piedmont section of North Carolina.

The witnesses who testified at the hearings as to the need of these trains included:

1. Four members of the U. S. Army assigned to the Office of Ordinance Research located at Duke University who testified that the continuation of the trains was necessary for the satisfactory performance of their duties (relating to anti-missile missile work). Their individual annual use of the train was fifteen to twenty trips a year.

2. Two students at Duke University testified as to their and other students' use and need of the trains.

3. Professors from Duke University and the University of North Carolina who testified as to the need of the trains in carrying on their duties.

4. Patients at Duke Hospital who testified as to the medical necessity of the trains in getting to and from their home in New York to the hospital.

5. Testimony of a Research Chemist from Philadelphia, Pennsylvania, as to his use and need for the transportation.

6. A textile executive from New York City whose company owns a mill in Durham testified as to his necessity for the use of the trains.

7. The Director of Transportation for Burlington Industries, Inc., Burlington, North Carolina, testified as to the need for the trains both for employees of the company and for buyers, suppliers and technical people visiting the plants of the company.[9]

8. The President of the Research Triangle Institute, a recently established nonprofit organization providing research service to corporations, governmental agencies and foundations, testified as to the use and need of the trains by his staff, and that the continued operation of the trains was extremely important to the proper functions of his organization. The Institute staff consists of 86 full time members today; it is anticipated that this figure will be 170 by the end of 1962.

8. Fifty of North Carolina's 100 counties are without passenger rail service. Durham County is ⅛ larger in population than the largest County without such service. Record before North Carolina Supreme Court, p. 259.

9. 30–40 employees of Burlington Industries are "regular" users, averaging approximately one trip a month each. Customers and buyers (especially women buyers) also use the train. Burlington Industries has assisted Southern in the removal of other schedules and originally did not protest the discontinuance involved here. Subsequent studies of the company needs caused Burlington to reverse its position. I.C.C. Record, Vol. 111, pp. 374–6.

9. The President of the Golden Belt Manufacturing Company of Durham testified as to his use and need of the train. This witness explained the necessity for train travel in the operation of his business.

10. The President of the Burlington Chamber of Commerce testified that rail passenger service was instrumental in the growth of Burlington and that the discontinuance of trains would seriously handicap the area.

11. A Burlington Executive testified as to the need for the trains by himself, his buyers, and his customers.

12. The Dean of Trinity College of Duke University, who made twenty to twenty-five trips a year himself, testified as to the need and convenience of the trains.

13. The Secretary of the Committee on Educational Institutions of the Duke Endowment testified that his work required use of these trains.

14. A Professor of Physics and a Member of the Advisory Committee of Reactor Safeguards, a part of the Atomic Energy Commission, testified that his work required the use of the trains at an average rate of a trip per month.

15. The President of Duke University testified to his use of the trains and that of his trustees and that their continuance was a matter of convenience and necessity. (He had made five trips to New York since the first of the year.)

16. The General Manager of the Jack Tar Hotel in Durham testified that the continued operations of the trains serve a necessary and convenient purpose for the guests who stay at his hotel and that the removal of the trains would not only be detrimental to efforts to attract conventions to Durham, but would inconvenience those persons attending such conventions.

17. The Director of Durham's Committee of 100 testified as to the need of the trains in locating and retaining industry in the Durham Area.

18. The President of the Southerland Dye and Finishing Plant in Mebane, North Carolina, testified as to his use of the trains and their need in his area.

19. The Office Manager of the Belk Leggett Department Store in Durham testified as to his store's need of the trains for sending buyers to New York. The buyers consist of a group of four to six people going to New York once a month, ten months out of the year.

20. There was evidence of the need of the service in the industrial development of the area from Justin Kingston, a New York textile executive, now building a plant in Durham to employ two hundred to three hundred employees; from the Director of Transportation for Burlington Industries; from George Watts Hill, Chairman of the Board of the Home Security Life Insurance Company and of the Durham Bank and Trust Company, and numerous others. In addition, one witness, Dr. Thomas Powell, a man with an investment of a million dollars in the biological supply business in Elon, North Carolina, testified that the loss of rail passenger service might cause that business to leave North Carolina.

21. Evidence indicated that there are three universities in or near Durham (two in Durham, one in Chapel Hill in Orange County). A total of 14,737 students attended these institutions in 1958-9 and attendance is steadily increasing. There are eight hospitals located in or near Durham. Six are within ten minutes by ambulance or auto from the Durham railroad passenger service. The other two, Butner and Memorial Hospital are within twenty to twenty-five minutes. These hospitals treated a total of over 431,000 patients in 1959.

To summarize, in addition to the need for the services by the general public, the testimony indicated the need existed as to four principal areas: industry, hospitals, Duke University, and the U. S. Army.

The record indicates that the trains serve a growing area. The Durham-Bur-

lington area is already heavily industrialized, with Burlington Mills and Western Electric predominating in Burlington, and the cigarette industry in Durham. In addition, in the opinion of Southern's General Industrial Agent "this area holds great promise in the field of industrial development * * * the new Research Triangle will give tremendous impetus to this growth and create ever-increasing industrial interest in this section." (Southern's freight traffic on the Greensboro-Goldsboro line may be expected to benefit accordingly.)

That this is a growing area would be meaningless if the growth was not reflected in increasing use of the trains. Southern points to a very large decline in passengers from the year 1948 (an average of 77.51 per trip) to 1960 (an average of 20.2 per trip). This decline would seem to reflect the general revolution in transportation caused by the shift in travel from railways to air, bus, and private car. This decline appears to have bottomed out, however, and recent figures indicate that the use of the trains is increasing with the growth of the area:

PASSENGERS [10]

| | 1959 | 1960 | 1961 (5 months) |
|---|---|---|---|
| Total | 14,251 | 14,776 | 8,934 |
| Daily Average | 19.5 | 20.2 | 29.6 |
| Average Passenger mile per train mile [11] | 6.83 | 7.33 | 9.97 |

We note that the statute refers to "the present or *future* public convenience and necessity."

The increase in use may not be substantial (although it represents an increase of nearly 60% in the daily average number of passengers patronizing these trains in the first five months of 1961 as compared with the entire year of 1959), but must be viewed in the light of Southern's failure to seek passengers. Plaintiffs accuse Southern of making a deliberate effort to discourage passenger service on the trains. Be that as it may, there is considerable evidence that Southern has done little, if anything, to promote greater use of these trains. The last advertising for the service before the commencement of

these hearings occurred in 1951;[12] the president of the Research Triangle Institute testified that his associates did not know of the service until he told them. In contrast, there was testimony that Seaboard, with reference to its Raleigh service, actively advertised and solicited patronage and operated a well-staffed passenger office.

▆▆▆ The ICC emphasized the availability of other means of travel to serve this area. There is good bus and air service, and the number of private automobiles is larger than the state-wide average. The fact of other methods of travel is a factor to be considered but it is not decisive. The statute speaks of convenience as well as of necessity. Also, the existence of *alternative* modes of

10. These figures do not include any pass riders, which were estimated at the hearing before the State Utilities Commission at 8% of the total passengers.

11. The evidence does not disclose the average number of passengers per train mile on the 55 mile portion of the line between Greensboro and Durham, although the principal public convenience presently afforded by trains Nos. 13 and 16

related to travel between these two cities. The line between Greensboro and Goldsboro is 129 miles long.

12. Six advertisements appeared in the Durham paper in 1960. ICC Record, Vol. 111, pp. 208, 335. The hearing before the North Carolina Public Utilities was on Oct. 6, 1959, and the decision was handed down on January 20, 1960.

travel in a heavily populated area should be considered a "convenience", and under some circumstances (such as air line strikes and bad weather) a "necessity."

What are the burdens imposed on interstate commerce by the operation of the trains?

The ICC found that the carrier's annual out-of-pocket savings resulting from the discontinuance of the two trains would exceed $90,000 each year.[13] On this same line of track the railroad made a net freight operating profit of $630,000 in 1960.

Taking into account total operation of this line, there is a profit not a loss, a benefit, not a burden. The relative amount of profit on one service and loss on the other is a factor.

When we turn from this particular line to the over-all operations of Southern Railway, we find that the over-all profit of Southern Railway in 1960 for its entire system was $30,702,542 after the payment of all taxes and all operating expenses. The figure for 1958 was $30,254,231 and for 1959 was $33,126,-744.[14] The accumulated surplus of Southern in 1960 was $343,594,070. The effect of the losses of the Greensboro-Goldsboro passenger service on the financial structure of the railroad is inconsequential.[15] The degree by which the loss impairs the ability of the carrier properly to serve interstate commerce is not substantial.

But it is unfair to compare the loss from a particular segment of a passenger rail line to the total profit of the company. Nor is this the test. The question is whether the particular segment of the railway involved is contributing its fair share to the over-all company operations, or whether its share constitutes a burden on the company and on interstate commerce. The evidence in the record is not clear or full on the question of whether this segment of the line is contributing its fair share to the over-all company operations, but the evidence points in the direction that the Greensboro-Goldsboro line contributes at least its fair share. For example, Southern's over-all passenger deficit in 1960 was $14,669,798 on its 2,913 passenger miles. The average loss per mile is then $5,035 on a system-wide basis. If we assume Southern's net operating passenger deficit on the Greensboro-Goldsboro line was $117,641 for 1960 (on a line of 130 miles); then the average loss per mile was $912.[16] The evidence further indicates that the average revenue per passenger mile in 1960 was .0305 for trains Nos. 13 and 16, as compared with a company wide average of .0296 and a North Carolina average of .0301, indicating a greater revenue per passenger mile on

13. Plaintiffs contended that the maximum out-of-pocket loss was only $33,688 in 1960, while Southern contended it would exceed $117,640. The difference is largely accounted for by plaintiffs' giving effect to the 58 per cent state and federal income tax deduction resulting from the deficit operation, on the ground that this is a cost borne by the state and national governments and thus would not affect the financial condition of the railroad itself and therefore could not affect interstate commerce by weakening the railroad's capital structure. But uneconomical transportation is not rendered less so by passing a portion of the burden to Federal and State governments in the form of reduced income taxes "an uneconomic outlay of funds would not be in the interest of transportation even though the money be derived from the national government." Purcell v. United States, 315 U.S. 381, 385, 62 S.Ct. 709, 711, 86 L.Ed. 910 (1942). As far as the effect of the deficit operation on the shareholders and the financial structure of Southern is concerned, however, the argument carries weight.

14. ICC Record, Vol. 11, p. 202.

15. As to its effect on shareholders, the loss in 1960 reduced net profits by .0016%, (after giving effect to state and federal income tax deductions).

16. This figure is only approximate. Mr. Gleason testified that the $14,669,798 included all losses while the $117,641 was only the out of pocket losses resulting solely from the trains' operations. ICC Record, Vol. 11, pp. 209–211.

the Greensboro-Goldsboro line than on the Southern's operations as a whole.[17]

We find no comparative figures relating to freight profits in the record. The amount of the freight profits on the Greensboro-Goldsboro line was apparently arrived at by taking 61% of the Southern Railway's average freight profits per mile multiplied by the total Greensboro-Goldsboro mileage.

■ The burdens of a public utility must be viewed in light of the principle that a public utility cannot shut off all unprofitable service—it must continue to serve, even at a loss as to some operations when the public convenience and necessity do not permit the loss of the service. Mr. Justice Frankfurter, in Alabama Public Service Comm. v. Southern Ry. Co., 341 U.S. 341, 71 S.Ct. 762, 770, 95 L.Ed. 1002 puts it:

> "Unlike a department store or a grocery [store], a railroad cannot of its own free will discontinue a particular service to the public because an item of its business has become unprofitable. * * * One of the duties of a railroad company doing business as a common carrier is that of providing reasonably adequate facilities for serving the public. This duty arises out of the acceptance and enjoyment of the powers and privileges granted by the State and endures so long as they are retained. It represents a part of what the company undertakes to do in return for them, and its performance cannot be avoided merely because it will be attended by some pecuniary loss."

■ Upon our examination of the entire record, in the light of the applicable principles of law, we fail to find substantial evidential facts to support the Commission's holding that the service in question constitutes an undue burden on the interstate aspects of the carrier's operations. The basic facts are not in conflict—nor is there any real conflict in the evidence offered by the parties. The question is whether there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. of New York v. N. L. R. B., 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1933); Davis, Administrative Law Treatise, Vol. 4, p. 186. We think there is not.

This court is specifically authorized by the Administrative Procedure Act (5 U.S.C.A. § 1009) to "hold unlawful and set aside agency action, findings, and conclusions found to be * * * arbitrary, capricious * * * or otherwise not in accordance with law * * * (or) unsupported by substantial evidence." By the provisions of Title 28, § 1336, jurisdiction is accorded to "set aside, (or) annul * * * any order of the Interstate Commerce Commission."

Pursuant to this authority, we hold unlawful and set aside the action of the Interstate Commerce Commission authorizing the carrier to abandon its passenger service. We also hold unlawful and set aside the ultimate conclusions of the Interstate Commerce Commission that the service in question constitutes an undue burden on interstate commerce and that the present or future public convenience and necessity permits such discontinuance. We hold that such action and conclusions are arbitrary and capricious because not in accordance with law and because not supported by substantial evidence.

We do not invalidate and do not set aside any of the subsidiary findings of fact made by the agency. Since we accord to them administrative finality, and since the record is complete bearing upon all aspects of the controversy, there would appear to be no occasion for remand. The procedure of remanding to an administrative agency is to afford the agency an opportunity to meet objections

---

17. For the first five months of 1961, the Greensboro-Goldsboro figures had fallen to .0274 compared to a company average of .0300. We find no figures for other years. ICC Record, Vol. 11, pp. 164–5.

to its order by correcting irregularities in procedure, or supplying deficiencies in its record, or making additional findings, or supplying findings validly made to take the place of those invalidated.[18] None of these purposes would be served by remanding this case to the Interstate Commerce Commission for the simple reason that we have noted no irregularities in procedure and no important deficiencies in the record, and for the additional reason that we have invalidated no subsidiary findings of fact but only ultimate conclusions of law and agency action.

Judgment for Plaintiffs.

18. 2 Am.Jur.2d, "Administrative Law" sec. 764.