STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION; AND STATE OF NORTH CAROLINA, CITY OF DURHAM, A MUNICIPAL CORPORATION, DUKE UNIVERSITY, ERWIN MILLS, INCORPORATED, COUNTY OF DURHAM, LIGGETT & MYERS TOBACCO COMPANY, MRS. MARY TRENT SEMANS, THE DURHAM CHAMBER OF COMMERCE, THE AMERICAN TOBACCO COMPANY, RESEARH TRIANGLE INSTITUTE, THE DURHAM MERCHANTS ASSOCIATION, INTERVENORS, V. SOUTHERN RAILWAY COMPANY.

(Filed 3 February, 1961.)

**1. Utilities Commission § 2—**

The Utilities Commission has power to require all transportation companies to establish and maintain all such public service facilities and conveniences as may be reasonable and just, G.S. 62-39, and a public service corporation has no legal right to discontinue an established service without authorization from the Commission.

**2. Utilities Commission § 5:    Carriers § 4—**

While the determination of a petition by a carrier to be allowed to discontinue an established service rests in large measure in the sound judgment and discretion of the Utilities Commission, and its order in regard thereto is *prima facie* just and reasonable, such order is reviewable to ascertain whether it is arbitrary or capricious or if the essential findings of fact on which it is based are supported by competent, material and substantial evidence. G.S. 62-96, G.S. 62-47, G.S. 62-26.10.

**3. Carriers § 4—**

Whether a carrier should be allowed to discontinue or reduce a particular service must be determined upon the basis of whether the advantage of the public convenience and necessity outweighs the disadvantage of the loss sustained by the carrier in maintaining such service when considered in connection with the carrier's revenues from its entire operations, and each case must be determined in accordance with its particular facts.

**4. Same—    Evidence held to support order denying carrier's petition for discontinuance of passenger trains.**

Defendant carrier petitioned to be allowed to discontinue its passenger trains between two designated cities 130 miles apart. The evidence tended

to show that the two trains in question afforded the only rail passenger service between the designated cities, that the discontinuance of the service would leave several counties without rail passenger service, that the territory affected was populous and expanding industrially, that one of the cities was a junction affording passengers connections with points on the main line of the carrier, that the loss from passenger travel on the trains in question was in line with the loss from passenger traffic on the facilities of the carrier as a whole, that the carrier had profitable freight traffic between the points in question, and that the loss on the trains in question did not endanger the financial stability of the carrier or materially affects its ability to maintain and acquire operating capital or its ability to realize a profit from its overall operations. *Held:* The record supports findings supporting the order of the Commission denying the petition, and shows that the Commission did not act arbitrarily or capriciously, and therefore the contention that the order deprived the carrier of property without due process of law is untenable.

**5. Same—**

The denial of a petition of a carrier to be allowed to discontinue passenger service between designated points does not preclude it from thereafter petitioning for like relief on the basis of its later experience in subsequent operations.

APPEAL by Southern Railway Company from *Hobgood, J.,* April 2, 1960, Regular Civil Term of WAKE.

On July 8, 1959, Southern Railway Company (Southern) filed its petition with the North Carolina Utilities Commission (Commission) for an order authorizing Southern to permanently discontinue its operation of "a pair of passenger trains," Nos. 13 and 16, between Greensboro, N. C., and Goldsboro, N. C., a distance of 129.1 miles.

Southern asserted: (1) It had incurred heavy loss, set forth in detail, in the operation of these trains during the 12-month period ending March 31, 1959; (2) public convenience and necessity no longer required the continued operation thereof; (3) required continued operation of these trains at heavy loss in the absence of public need therefor would (a) be contrary to and violate the statutes of North Carolina, (b) unduly burden interstate commerce, (c) confiscate Southern's property without just compensation and without due process of law, and (d) deny to Southern the equal protection of the law guaranteed by the North Carolina and United States Constitutions.

The State of North Carolina, through its Attorney General, intervened. G.S. 62-21. City of Durham, Duke University, Erwin Mills, Inc., County of Durham, Liggett & Myers Tobacco Company, Mrs. Mary Trent Semans, the Durham Chamber of Commerce, the American Tobacco Company, Research Triangle Institute, Sperry Rand

Corporation and the Durham Merchants Association were permitted, by appropriate order (s), to intervene as protestants.

Trains Nos. 13 and 16 are the only passenger trains now operated by Southern between Greensboro and Goldsboro.

The eastbound train, No. 16, leaves Greensboro daily at 6:10 a.m., makes 12 regular stops, with allowances for 9 flag stops, and arrives in Goldsboro at 10:45 a.m. Its principal regular stops en route are at Burlington (6:50 a.m.), Durham (7:55 a.m.), Raleigh (8:55 a.m.), and Selma (10:00 a.m.).

The westbound train, No. 13, leaves Goldsboro daily at 4:05 p.m., makes 10 regular stops, with allowances for 11 flag stops, and arrives in Greensboro at 8:50 p.m. Its principal regular stops en route are at Selma (4:50 p.m.), Raleigh (5:30 p.m.), Durham (6:55 p.m.), and Burlington (8:02 p.m.).

These trains carry express but no freight or mail. They consist of a 1500 h.p. diesel electric locomotive, a passenger-baggage car, a "straight" coach, and a ten-roomette, six-bedroom sleeping car, seven days each week. The sleeping car operates between Raleigh and Greensboro. A 60-foot express car operates five days a week between Greensboro and Goldsboro; also, a box and express car operates six days a week between Burlington and Greensboro. At Greensboro, the sleeping car on train No. 13 is attached to Southern's northbound train No. 38; and the sleeping car detached from Southern's southbound train No. 29 is attached to train No. 16. Generally, passengers make connections at Greensboro with trains on Southern's north-south main line.

The coaches on these trains have a capacity of 80 passengers and are equipped with modern facilities such as air-conditioning, wide windows, reclining seats, electric drinking fountains, etc. No food services or other types of concessions are provided on either train. The crews consist of an engineer, a fireman, a conductor, a baggage master, a flagman, a Pullman conductor, a Pullman porter, a regular porter, and an express messenger. Of these employees, six are paid by the railroad.

In October, 1959, at a hearing before the Commission, voluminous evidence, including testimony, documents and statistical charts, was presented. The Commission's order of January 20, 1960, includes: (1) An extended narrative of factual data; (2) findings of fact, including the specific finding that "public convenience and necessity exists for the operation of Passenger Trains Nos. 13 and 16"; (3) conclusions of law; and (4) a denial of Southern's petition. Commissioner Worthington dissented. Southern appealed.

In its notice of appeal, Southern, by assignments of error, asserted

that designated statements in the Commission's narrative of factual data and designated findings of fact are not supported by any competent, material and substantial evidence; that designated statements under the heading, "Conclusions," are erroneous; and that the Commission's order is "arbitrary and capricious, contrary to the law of North Carolina and the law of the United States, in violation of the Constitution of North Carolina and the Constitution of the United States, contrary to the Statutes of North Carolina, unsupported by any competent, material and substantial evidence, and otherwise unlawful and erroneous."

In the superior court, Southern's appeal was heard on the record as certified by the Commission. G.S. 62-26.10. The court, overruling Southern's exceptions and assignments of error, adopted, approved and confirmed "each Finding of Fact and Conclusion of Law" in the Commission's order. Judgment, providing that the Commission's order "be, and the said Order is hereby affirmed and sustained," was entered. Southern excepted, appealed and assigns errors.

*Attorney General Bruton and Assistant Attorney General Burns for the State.*

*Claude V. Jones for City of Durham, appellee.*

*E. C. Bryson for Duke University, appellee.*

*R. P. Reade for County of Durham, appellee.*

*A. H. Graham, Jr., for Erwin Mills, Inc., and Liggett & Myers Tobacco Company, appellees.*

*E. C. Brooks, Jr., for Mrs. Mary Trent Semans and the Durham Merchants Association, appellees.*

*Victor S. Bryant for the Durham Chamber of Commerce and American Tobacco Company, appellees.*

*Victor S. Bryant, Jr., for Research Triangle Institute, appellee.*

*Joyner & Howison, Arthur J. Dixon and Earl E. Eisenhart for defendant, appellant.*

BOBBITT, J.　Under G.S. 62-39, the Commission has power to require all transportation companies "to establish and maintain all such public service facilities and conveniences as may be reasonable and just." Also, see G.S. 62-30, G.S. 62-37, G.S. 62-46, G.S. 62-48 and G.S. 62-74.

A 1933 Statute, Public Laws of 1933, c. 307, s. 32, now codified as G.S. 62-96, provides: "Upon finding that public convenience and necessity are no longer served, or that there is no reasonable probability of a utility realizing sufficient revenue from the service to meet its expenses, the Commission shall have power, after petition, notice

and hearing, to authorize by order any utility to abandon or reduce its service or facilities."

Another 1933 statute, Public Laws of 1933, c. 528, s. 1, amended C.S. 3481 by providing, in pertinent part: "The Corporation Commission, or its successor, however, shall have and it is hereby vested with the power in any case in which the convenience and necessity of the traveling public do not require the running of passenger trains upon its railroad to authorize such railroad company to cease the operation of passenger trains as long as the convenience and necessity of the traveling public shall not require such operation." C.S. 3481, as amended, is now codified as G.S. 62-47.

A public service corporation has no legal right to discontinue an established service unless and until the Commission authorizes it to do so. *Sweetheart Lake, Inc., v. Light Co.*, 211 N.C. 269, 189 S.E. 785. The hearing, after notice, was on Southern's petition that the Commission authorize the discontinuance of passenger trains Nos. 13 and 16.

The power conferred by G.S. 62-96 and G.S. 62-47 *to authorize* such discontinuance indicates the General Assembly intended that the Commission exercise this power in large measure according to its judgment and discretion. Even so, an order allowing or denying a petition for such continuance is subject to judicial review and reversal if it is "arbitrary or capricious" or if the essential findings of fact on which it is based are "unsupported by competent, material and substantial evidence." G.S. 62-26.10. However, G.S. 62-26.10 provides that "(u)pon any appeal to the superior court, the rates fixed, or any rule, regulation, finding, determination, or order made by the Commission . . . shall be prima facie just and reasonable."

In *Utilities Com. v. Kinston*, 221 N.C. 359, 20 S.E. 2d 322, it was held that protestants who were not parties to the proceeding before the Commission had no right to appeal from the Commission's order authorizing the discontinuance of designated trains. The appeal presented no question as to the validity of the Commission's order.

In *Utilities Com. v. R. R.*, 233 N.C. 365, 64 S.E. 2d 272, the railroad's petition was for authority to close its agency at Stokes, that is, to dispense with the services of a local agent at the Stokes station. Railroad freight transportation service was afforded Stokes by a branch line. Stokes had no passenger service. The railroad did not seek authority to close its freight station at Stokes or to discontinue its freight service. As stated in the opinion: "The only difference would be that incoming freight must be prepaid, and that notice of arrival would be mailed from Washington instead of Stokes, and that waybills and receipts for freight from Stokes would be handled by the

train conductor. Less than carload shipments would be unloaded and deposited in the station building, and consignee notified." In reversing the Commission's order, this Court said: "We think the finding of the Utilities Commission affirmed by the court below is not supported by material and substantial evidence, and that the order denying application for discontinuance of agency service at Stokes under the evidence did not measure up to the standard of reasonableness and justice required by the statute." Two excerpts from the opinion of *Devin, J.* (later *C.J.*), are quoted below:

"The power conferred by statute upon the Utilities Commission to require transportation companies to maintain substantial service to the public in the performance of an absolute duty will not be denied even though the service may be unremunerative when singled out and related only to a particular instance or locality, if the loss be viewed in relation to and as a part of the over-all operations of transportation, rather than as incidental and collateral thereto.

". . .

"Questions of convenience to individuals and to the public find their limitations in the criterion of reasonableness and justice. No absolute rule can be set up and applied to all cases. The facts in each case must be considered to determine whether public convenience and necessity require the service to be maintained or permit its discontinuance. The benefit to the one of the abandonment must be weighed against the inconvenience to which the other may be subjected. The question to be decided is whether the loss resulting from the agency is out of proportion to any benefit to an individual or the public."

Applying these legal principles, this Court, in *Utilities Com. v. R. R.*, 235 N.C. 273, 69 S.E. 2d 502, held the evidence sufficient to support the Commission's order denying the railroad's petition for authority to discontinue *agency service* at Lucama; and, in *Utilities Commission v. R. R.*, 238 N.C. 701, 78 S.E. 2d 780, this Court held the evidence sufficient to support the Commission's order denying the railroad's petition for authority "to change Fremont, North Carolina, from a regular stop to a flag stop for its passenger trains numbers 48 and 49."

"The doctrine of convenience and necessity has been the subject of much judicial consideration. No set rule can be used as a yardstick and applied to all cases alike. This doctrine is a relative or elastic theory rather than an abstract or absolute rule. The facts in each case must be separately considered and from those facts it must

be determined whether or not public convenience and necessity require a given service to be performed or dispensed with. . . . The convenience and necessity required are those of the public and not of an individual or individuals." *Illinois Cent. R. Co. v. Illinois Commerce Commission*, 397 Ill. 323, 74 N.E. 2d 545. Quoted with approval in *Utilities Commission v. Casey*, 245 N.C. 297, 302, 96 S.E. 2d 8, and in cases cited therein.

In *Utilities Commission v. Trucking Co.*, 223 N.C. 687, 690, 28 S.E. 2d 201, *Stacy, C.J.*, said: "It is to be remembered that what constitutes 'public convenience and necessity' is primarily an administrative question with a number of imponderables to be taken into consideration, *e.g.*, whether there is a substantial public need for the service; whether the existing carriers can reasonably meet this need, and whether it would endanger or impair the operations of existing carriers contrary to the public interest. Precisely for this reason its determination by the Utilities Commission is made not simply *prima facie* evidence of its validity, but *'prima facie* just and reasonable.'"

"Necessity means reasonably necessary and not absolutely imperative. . . . The convenience of the public must not be circumscribed by holding the term 'necessity' to mean an essential requisite. . . . It is necessary if it appears reasonably requisite, is suited to and tends to promote the accommodation of the public." *Mulcahy v. Public Service Commission*, 101 Utah 245, 117 P. 2d 298, 300. Quoted with approval in *Seaboard Air Line R. Co. v. Commonwealth (Va.)*, 71 S.E. 2d 146.

In determining whether a railroad should be required to continue to operate trains, these criteria are controlling: "(1) The character and population of the territory served; (2) the public patronage or lack of it; (3) the facilities remaining; (4) the expense of operation as compared with the revenue from it; and (5) the operations of the carrier as a whole." *Southern Railway Company v. Commonwealth (Va.)*, 86 S.E. 2d 839; Annotation, 10 A.L.R. 2d 1143 *et seq.*, and cases cited. As to the fifth criterion, see *R. R. Connection Case*, 137 N.C. 1, 15, 49 S.E. 191, affirmed 206 U.S. 1, 27 S. Ct. 585, 51 L. Ed. 933.

In 10 A.L.R. 2d 1143, this statement appears: "The great weight of the decisions, both court and commission, is to the effect that, in considering the question whether or not a public utility company should be compelled to continue the operation of a branch line, the entire revenues of the system are to be considered, and not merely the direct return from the branch line itself; . . ."

Southern, in its brief, states it does not contend "that its property is being confiscated in the sense that the forced continued operation

of these trains will result in its being required to operate at an over-
all financial loss or at such a low profit that it will not earn a fair
rate of return in the constitutional sense." Rather, it contends a
prosperous railroad is deprived of its property without due process
of law "if it is required to render a losing service where there is no
reasonable public need for that service — that is, a capricious and
unreasonable taking of property cannot be justified on the ground
of the prosperity of the person from whom the property is taken."
This contention is relevant only if the Commission's order is arbi-
trary and capricious.

In *Pennsylvania-Reading Sea. Lines v. Board of Pub. U. (N.J.)*,
74 A. 2d 265, the only decision cited by Southern in support of its
said constitutional contention, the New Jersey Court upheld an
order authorizing the discontinuance of passenger trains. It is noted
that the order made by the Board of Public Utility Commissioners
was based on this finding of fact: "In our opinion the evidence wholly
fails to support a finding that public convenience and necessity re-
quire continuance of passenger train operation on the Penns Grove
Branch between Woodbury and Penns Grove. *The continuing deficits
experienced in the operation of the branch and the entire system of
the Pennsylvania-Reading Seashore Lines jeopardize essential serv-
ices performed by the utility.* Continued operation of nonessential
service at a substantial continuing loss, particularly where as here
another means of reasonably convenient public transportation is
available, is, in our opinion, not justified as in the public interest."
(Our italics.)

As stated in *Fleming v. Commonwealth (Va.)*, 61 S.E. 2d 1, 4:
"It is a matter of common knowledge that a revolutionary change
has taken place in the field of passenger transportation. Travel by
air, water, buses, and by privately owned automobiles has largely
brought about the change. The railroads no longer have a monopoly
on transporting passengers. The local railroad passenger travel largely
has been transferred from the railroads to the highways, and this
competition has, to a great extent, caused the loss to local passenger
business. Public service commissions and courts cannot shut their eyes
to the changed conditions when considering public convenience and ne-
cessity and adequate public service facilities and conveniences that are
reasonable and just." The emphasis here is upon local passenger busi-
ness. The trains involved ran between Danville and Richmond. It
is common knowledge that Danville is on the main line of the
Southern and that Richmond is on the main line of the Seaboard.

Southern's petition is not for the *reduction* of its passenger service,
the question presented in *Fleming v. Commonwealth (Va.), supra,*

and in *Southern Railway Company v. Commonwealth (Va.), supra.*
In this connection, it is noted that the Virginia Court upheld the
State Corporation Commission's order denying Southern's petition for
authority to discontinue the operation of trains Nos. 11 and 12 be-
tween Richmond and Danville, *Southern Ry. Co. v. Commonwealth
(Va.),* 68 S.E. 2d 552, and in the later case (*Southern Railway Com-
pany v. Commonwealth (Va.),* 86 S.E. 2d 839) reversed an order
denying Southern's petition for authority to discontinue the operation
of trains Nos. 7 and 14, then noting that the service on trains Nos.
11 and 12 would continue.

Moreover, Southern's petition is not for the reduction of an inci-
dental or collateral service, such as the discontinuance of a station
as an agency station, the question presented in two of the North Caro-
lina cases cited above and in *Atlantic Coast Line R. Co. v. Common-
wealth (Va.),* 61 S.E. 2d 5, and in *Illinois Cent. R. Co. v. Illinois
Commerce Commission, supra.*

Southern's petition is for authority to abandon entirely and perma-
nently *all* passenger service *on all portions* of the Greensboro-Golds-
boro Line. If granted, Southern would no longer sustain the loss re-
sulting from the actual operation of trains Nos. 13 and 16. In addition,
Southern could dispose of passenger station facilities and release
personnel employed at such facilities. On the other hand, there would
be no east-west rail passenger service of any kind between Greens-
boro and Goldsboro. Moreover, there would be no rail passenger
service of any kind for the counties of Durham, Orange and Ala-
mance.

Until September, 1954, Southern operated three pairs of passenger
trains on its Greensboro-Goldsboro line. It was then authorized to
discontinue trains Nos. 21 and 22. Thereafter, in April, 1958, it was
authorized to discontinue trains Nos. 111 and 112, thus reducing its
passenger service to the trains here involved, Nos. 13 and 16. On
February 3, 1959, it was authorized to discontinue the Asheville-
Raleigh sleeper. Thus, prior to the filing on July 8, 1959, of its present
petition, the sleeper service between Raleigh and Asheville had been
discontinued, and the passenger service greatly reduced in respect of
the public convenience afforded local passengers. Railway mail serv-
ice was discontinued December 14, 1957. The authorized discon-
tinuance of these trains and services would seem to dispel any sug-
gestion that the Commission's attitude has been arbitrary or capricious.

The principal public convenience presently afforded by trains Nos.
13 and 16 derives from the connections these trains make at Greens-
boro with north-south trains on Southern's main line. They provide
continuous passenger travel, including Pullman service, to and from

Washington, New York and intermediate points. There is evidence that persons in the Durham-Chapel Hill area who are advised of this service make substantial use of it. Various reasons are given for preferring this service to travel by air or by bus or by boarding the Seaboard at Raleigh, including the schedule, the overnight travel, the convenience of continuous travel, its dependability notwithstanding adverse weather conditions, etc. Even so, Southern contends that the number of persons using said trains, when available alternative methods of transportation are considered, is insufficient to permit their convenience to outweigh the loss Southern suffers by the operation thereof.

Southern offered evidence as to the results of its operations for the twelve months ending May 31, 1959. The data submitted indicates 16,583 fare-paying passengers rode trains Nos. 13 and 16 during this period. (Note: There was evidence that an additional 1,480 passengers rode on passes.) Treating the run between Greensboro and Goldsboro as 130 miles, Southern's data shows the average number of fare-paying passengers per mile for the full distance as 8.17. Although, as indicated above, the principal public convenience presently afforded by trains Nos. 13 and 16 relates to travel between Durham and Greensboro, the data submitted does not disclose the average number of passengers per train mile on this portion (55 miles) of the Greensboro-Goldsboro line. It is this portion of the line, with it long haul connections, to which protestants' evidence as to public convenience and necessity is largely directed.

There is much evidence that Southern has done little, if anything, to promote greater use of these trains. The latest advertising of Southern's passenger service on the Greensboro-Goldsboro line Southern's General Passenger Agent could recall was an advertisement of round trip coach fares, effective May 1, through November 15, 1950. At Durham, Southern has no telephone service for reservations except during the hours the passenger (ticket) agent is on duty, that is, from 10:30 a.m. to 12:30 p.m. and from 1:30 p.m. to 7:30 p.m. A porter is on duty from 7:00 a.m. to 9:00 a.m. and from 5:30 p.m. to 7:30 p.m. In contrast, there was testimony that the Seaboard, with reference to its service in and out of Raleigh, actively solicits patronage from the Durham area by advertising its trains and where reservations may be made and tickets obtained, has a well-staffed office in Durham and runs a truck between Durham and Raleigh to take care of the baggage. In short, there is evidence from which it may be reasonably inferred that greater use of trains Nos. 13 and 16 would be made, particularly on the portion of the line between

Durham and Greensboro, if Southern made greater efforts to promote and stimulate such use.

Southern's trackage covers 6,300 miles, of which 1,284 miles is in North Carolina. In 1958, according to Southern's evidence, the net railway operating deficit from its over-all passenger service operations was $17,495,033. According to Southern's Supervisory Statistician, 31.8 cents of every dollar made on its freight service operations was consumed by the passenger deficit. Notwithstanding, Southern's net profit for 1958, after payment of all taxes and all expenses, was $30,254,231. For 1958, Southern paid dividends in the amount of $21,119,892. On December 31, 1958, after payment of all dividends, Southern's total surplus from accumulated operating profits (total retained net income) was $336,206,843. This amount is included in the stockholders' equity as of December 31, 1958, to wit, $525,748,143. Suffice to say, there is no evidence the required continued operation of trains Nos. 13 and 16 will substantially impair the credit or undermine the solvency of Southern. In this respect, *Maine Central Railroad Co. v. Public Utilities Com'n (Me.)*, 163 A. 2d 633, stressed by Southern, is distinguishable.

According to Southern's evidence, for the twelve months ending May 31, 1959, direct expenses ($195,814) in excess of revenues ($54,089) amounted to $141,725. The Commission found that these trains had been operated at a loss. Diverse conclusions may be drawn as to the extent of such loss. It is noteworthy that Southern's statement of revenues for the twelve months ending May 31, 1959, reflects only the revenue for the distance traveled on trains Nos. 13 and 16. There was testimony that, for the period July 1 through September 15, 1959, 1,393 of the 2,757 passengers on Nos. 13 and 16 moved on Southern trains beyond Greensboro; and that for every dollar allocated to the Greensboro-Goldsboro line Southern received approximately four dollars in revenue for the distance traveled by these passengers on Southern's main line trains.

While the amount of several items in Southern's statement of expenses for said period were challenged, we refer only to these items: (1) An item of $16,608, "Pullman Co. Net Loss." It is conceded that $12,900 of this item was on account of the Asheville-Raleigh sleeper (discontinued February 3, 1959) and is a non-recurring expense. (2) An item of $9,500, paid for "Injuries to Persons," is a non-recurring expense.

Whatever the operating loss incurred by Southern on trains Nos. 13 and 16, such loss was deductible in computing Southern's income taxes. The Federal and State taxes on Southern's net income amounted to 57% thereof. Hence, Southern's actual loss for the operation of

trains Nos. 13 and 16, considered in the context of its overall operations, would be no more than 43% of the loss incident to the operation of these two trains.

As indicated above, Southern's evidence discloses that the net railway operating deficit from its over-all passenger service operations in 1958 was $17,495,033. Assuming passenger operations on all of Southern's 6,300 miles, the average loss per mile was $2,776.99. If we assume Southern's net railway operating deficit on the Greensboro-Goldsboro line (130 miles) was $141,725, the average loss per mile was $1,090.19.

It was stipulated that, in proceedings before the Commission in 1957 and 1958, passenger operating deficits were considered as a factor in granting freight rate increases to all railroads operating in North Carolina.

The facts concerning Durham, Orange and Alamance Counties are matters of common knowledge and need not be stated in detail. Suffice to say, this is a central, strategic and populous part of North Carolina. The size and importance of the universities, colleges and hospitals located in the area are well known. In addition to important industries heretofore established, further extensive industrial development is anticipated. Indeed, in the opinion of Southern's General Industrial Agent, "this area holds great promise in the field of industrial development. . . . the new Research Triangle will give tremendous impetus to this growth and create ever-increasing industrial interest in this section." Southern's freight traffic on the Greensboro-Goldsboro line, already lucrative, is expected to benefit greatly by such further development.

It is noted that Southern's General Passenger Agent could recall only five cities in the United States with a population in excess of 70,000 without rail passenger service. If trains Nos. 13 and 16 were discontinued, the City of Durham would be added to this short list.

We deem it unnecessary to discuss the evidence relating to whether public convenience and necessity requires the continuance of the express service now provided by trains Nos. 13 and 16. Moreover, there are other particulars, some favorable to Southern and others favorable to protestants, which we have not discussed. None is deemed of sufficient significance to affect our decision.

The question before us is not whether the Commission's order is in accord with our judgment but whether it is lawful. Our conclusion, after careful consideration of the voluminous record, is that the Commission's denial of Southern's petition was not arbitrary or capricious or unsupported by competent, material and substantial

evidence. Hence, the judgment of the court below affirming the Commission's order is affirmed.

Southern may petition again for authority to discontinue trains Nos. 13 and 16. The Commission's order simply denies authority to abandon *entirely and immediately* all passenger service on all portions of this historic line. In the event Southern should again petition for such authority on the basis of its experience in subsequent operations, it would seem appropriate that it first take all reasonable steps to publicize and improve the service rendered by these trains; and, on the other hand, it would seem appropriate for those who contend public convenience and necessity require the continued operation thereof to make and promote greater use thereof.

Affirmed.