STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION, AND THE GREYHOUND CORPORATION v. CAROLINA COACH COMPANY AND QUEEN CITY COACH COMPANY.

AND

STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION, AND THE GREYHOUND CORPORATION v. CAROLINA COACH COMPANY.

AND

STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION, AND CAROLINA COACH COMPANY, v. THE GREYHOUND CORPORATION.

(Filed 19 July 1963.)

**1. Carriers § 2;   Utilities Commission § 3—**

Agreements between carriers respecting service to the public are valid when approved by the Utilities Commission since the law favors such

agreements provided the paramount interests of the public are protected. G.S. 62-121.64(a), G.S. 62-121.48.

**2. Same—**

An order of the Utilities Commission approving a contract between carriers respecting their service to the public is *prima facie* just and reasonable, G.S. 62-26.10, and the Commission may not arbitrarily or capriciously rescind such order of approval, but may rescind such order only after notice to the carriers affected and an opportunity to them to be heard for change of circumstances requiring such rescission in the public interest. G.S. 62-26.5.

**3. Same;    Utilities Commission § 7—**

The improvement and construction of highways between two municipalities making feasible a new and quicker bus route between them is sufficient change of condition to empower the Utilities Commission to modify or rescind a prior order entered by it approving an agreement between two carriers in regard to their respective services to the public between the two municipalities along the older routes.

**4. Utilities Commission § 1;    Monopolies § 1—**

A contract between carriers with regard to their respective services to the public which is approved by the Utilities Commission is not void under the anti-monopoly statute, G.S. 75-1, since the Utilities Commission has the power to grant monopilistic authority to safeguard the public interest against excessive competition, and if it could have entered such order in a contested proceeding it can approve an agreement of the utilities to the same import.

**5. Utilities Commission §§ 1, 3—**

An application for a new authority to carry passengers between two municipalities of the State along a new route made feasible by the improvement or construction of highways may be treated by the Utilities Commission as a motion in a prior cause in which the Commission approved an agreement of the carriers in regard to their respective services between the cities, provided the carriers affected are given notice and an opportunity to be heard, and thus obviate the question whether the prior order of approval may be collaterally attacked.

**6. Carriers § 2;    Utilities Commission § 3—**

The order of the Utilities Commission granting authority to applicant to provide bus service between two municipalities of the State along a new route made feasible by the improvement and construction of highways, is approved in this case, the findings of the Commission being supported by material and competent evidence and its conclusions, including its holding that the granting of the authority will not unreasonably impair the financial stability and efficient public service of applicant's competitors, being permissible upon the facts found.

**7. Carriers § 2;    Utilities Commission §§ 1, 9—**

The determination of public convenience and necessity involves numerous imponderables to be resolved upon the facts of each particular case,

UTILITIES COMM. *v.* COACH CO. AND UTILITIES COMM. *v.* GREYHOUND CORP.

and is primarily an administrative question addressed to the Utilities Commission, and it is not for the courts to find the facts or to regulate utilities. Therefore, a determination by the Utilities Commission within the authority conferred upon it and warranted by the facts found upon supporting evidence will not be disturbed even though the courts might have reached a different result upon the same facts.

**8. Carriers § 2;   Utilities Commission § 3—**

G.S. 62-121.52(7) does not preclude the Utilities Commission from granting authority to two or more carriers to traverse the same segment of highway so long as they do not render duplicate service.

**9. Utilities Commission § 1—   Utilities Commission is not confined to immediate scope of pleadings but may enlarge the inquiry upon notice.**

The Utilities Commission is not confined to the immediate scope of the pleadings filed, and may enlarge the scope of the inquiry and grant an application, subject to such reasonable terms, conditions, and limitations as public convenience and necessity may require, G.S. 26-120.53, and therefore it may grant a "closed door" authority even though the application is for authority to duplicate service; likewise when a carrier seeks an alternate route authority the Commission may treat it as an application for a new authority when the application does not come within the Commission's rules defining alternate routes, the parties to be affected being before the court, participating in the proceedings, and having full opportunity to be heard.

**10. Carriers § 2;   Utilities Commission § 3—**

Where the principal business of a carrier is the transportation of passengers between two cities of the State along a route serving a number of other cities, and the improvement and construction of highways makes feasible a new and more direct route between the termini, the Utilities Commission, upon appropriate findings of fact, may grant such carrier "closed door" authority along the new route, notwithstanding that other carriers, respectively, serve segments of the route in "open door" operations.

**11. Utilities Commission § 9—**

Order of the Utilities Commission revoking its prior order approving an agreement between carriers in regard to their respective services along the route in question and substituting in lieu thereof an order of the Commission having the same effect as the agreement, is reversed, there being no evidence to support the Commission's conclusion that the new order will promote harmony among the carriers, G.S. 66-121.44, G.S. 62-121.48(3), and there being no showing of a change of condition requiring a revision of the prior order in the public interest.

APPEALS by Carolina Coach Company, Greyhound Corporation and Queen City Coach Company from *Copeland, S.J.,* November 1962 Term of WAKE.

These proceedings originated before the Utilities Commission upon applications of Greyhound Corporation (Greyhound) and Carolina Coach Company (Carolina) for passenger bus franchise authority over certain highway routes within the State. The three proceedings were docketed in Supreme Court as separate appeals. We have consolidated them for convenience in delivering this opinion — they are interrelated in many aspects.

Case No. 465.   Queen City Coach Company (Queen City) and Carolina appeal.

Case No. 466.   Carolina appeals.

Case No. 467.   Greyhound appeals.

*Newsom, Graham, Strayhorn & Hedrick for The Greyhound Corporation.*

*Allen and Steed for Carolina Coach Company.*

*Joyner & Howison for Queen City Coach Company.*

MOORE, J.   Carolina, Greyhound and Queen City are common carriers of passengers, their baggage, mail, and light express, in the same vehicle with passengers, by motor vehicle operating over interstate and intrastate franchise routes within the State of North Carolina.

Prior to the institution of the instant proceedings these carriers had, among others, the following franchise routes, respectively:

(a).   Carolina — (1) Between Raleigh and Charlotte by way of Durham, Burlington, Greensboro, Lexington, Salisbury and Concord, over U. S. Highways 70 and 29; (2) Between Raleigh and Charlotte via Sanford, Biscoe and Albemarle, over U. S. Highways 1 and 15 and N. C. Highway 27.

(b).   Greyhound — (1) Between Raleigh and Winston-Salem via Pittsboro, Asheboro and Lexington, over U. S. Highways 64 and 52; (2) Between Winston-Salem and Charlotte via Mocksville, Statesville and Mooresville, over U. S. Highways 158, 64 and 21.

(c).   Queen City — (1) Between Asheboro and Mount Pleasant over N. C. Highway 49. Mount Pleasant is 45 miles southwest of Asheboro and 26 miles northeast of Charlotte. After the instant proceedings were filed, but before orders were entered, the Commission granted Queen City franchise authority between Mount Pleasant and Charlotte over Highways 49 and 29. Queen City had previously operated between Mount Pleasant and Charlotte under an agreement with Carolina.

The franchise routes referred to are not described with absolute accuracy. Technical correctness of location is not important in the determination of these appeals.

In the early 1940s the Atlantic Greyhound Corporation (which has since merged with the Greyhound Corporation) had acquired *interstate* authority between Charlotte and Winston-Salem via Lexington over Highways 29 and 52, but did not have *intrastate* authority between Charlotte and Lexington over Highway 29. Carolina had the intrastate authority for this segment. Greyhound had both intrastate and interstate service north of Winston-Salem, the interstate extending to New York and other metropolitan areas; it also had interstate and intrastate service south and west of Charlotte, the interstate service extending to Miami, New Orleans and other southern metropolitan areas. The route between Winston-Salem and Charlotte via Lexington, over Highways 52 and 29, is shorter and requires less travel time than the route by way of Statesville over Highways 158, 64 and 21. To enable Greyhound to transport certain intrastate passengers over the Lexington route and at the same time to protect Carolina with respect to certain of its routes and passengers, a lease agreement was voluntarily entered into between Carolina and Greyhound, dated 1 August 1947. Carolina leased to Greyhound the privilege of transporting over the Lexington route intrastate passengers originating at or moving through Charlotte destined for Winston-Salem and points beyond, and intrastate passengers originating at or moving through Winston-Salem and destined for Charlotte or points beyond. On its part Greyhound agreed: (1) to operate with closed doors between the corporate limits of Lexington and the corporate limits of Charlotte and not to pick up or discharge any intrastate passengers at any intermediate points along said route; (2) not to pick up intrastate passengers at Lexington or at intermediate points between Lexington and Charlotte, destined to Charlotte or to any intermediate points between Charlotte and Lexington or to any intrastate points beyond Charlotte; (3) not to pick up any intrastate passengers at Charlotte, moving over this route, or at intermediate points between Charlotte and Lexington destined for Lexington or intermediate points between Charlotte and Lexington or to points between Lexington and Winston-Salem; (4) not to operate through service without change of buses between Raleigh and Charlotte by way of Lexington over Highways 64 and 29, "or compete with Carolina for intrastate traffic moving between Raleigh . . . and Charlotte . . ., irrespective of points of origin or destination"; (5) not to exchange between its schedules, operated over its present franchise route through Lexington and over the leased route,

intrastate passengers at Lexington irrespective of the point of origin or destination of such passengers, and to deliver to Carolina at Lexington all intrastate passengers moving by Greyhound into Lexington, irrespectve of point of origin, destined to points between Lexington and Charlotte, and to deliver to Carolina at Charlotte all intrastate passengers moving by Greyhound into Charlotte, irrespective of the point of origin, destined to points between Charlotte and Lexington; (6) not to seek any intrastate franchise or permission to operate over the route leased during the term of this agreement, or any renewal thereof, except under the terms of this agreement. The term of the lease agreement was three years with an automatic extension of three years upon renewal of Carolina's franchise by the Utilities Commission. The effectiveness of the lease agreement was conditioned upon its prior approval by the Utilities Commission. Upon the joint petition of Carolina and Greyhound the Commission entered an order of approval. When the Carolina franchise became permanent by virtue of the Bus Act of 1949, the parties to the lease agreement contracted in writing that it would terminate only upon cancellation of Carolina's franchise by the Utilities Commission. This extension agreement was approved by the Commission.

Greyhound and Carolina operated under the terms of the lease agreement without any question as to its validity until 1960. In the meantime the State Highway Commission had begun to greatly improve N. C. Highway 49 from Charlotte to Asheboro, and by 1960 the improvements were nearing completion. As improved, Highway 49 was in excellent condition for bus travel, and the route by way of Asheboro over Highways 64 and 49 constituted the shortest and fastest route between Raleigh and Charlotte. It is much shorter than any other established through route. By reason of the improvement of Highway 49, a Raleigh-Charlotte franchise via Asheboro became very desirable. But before the improvements were made Highway 49 was ill adapted to bus service, both because of the condition of the highway and the sparseness of the population along the route. Queen City had the franchise between Mount Pleasant and Asheboro and operated over Highway 49 one round trip daily.

On 13 September 1960 Greyhound advised Carolina by letter that it considered the lease agreement of doubtful validity and requested that it be cancelled by mutual consent. By letter of 30 September Carolina declined to cancel. Greyhound then advised the Utilities Commission that it considered the lease agreement void, did not desire

to continue service under its provisions, and requested instructions. The Commission directed Greyhound to render service as before, until such time as the Commission should authorize it to discontinue.

Both Carolina and Greyhound applied to the Utilities Commission for franchise authority to operate "no change" service between Raleigh and Charlotte via Asheboro over Highways 64 and 49.

- I -

*Case No. 465.* On 5 October 1960 Greyhound applied for intrastate franchise authority over the route between Asheboro and Charlotte on Highway 49 (Queen City's route), to combine such operation with the operation being conducted by Greyhound between Asheboro and Raleigh on Highway 64, so as to provide through service from Raleigh to Charlotte and vice versa, but restricted between Asheboro and Charlotte against passengers whose entire ride is between these two points.

Carolina and Queen City filed protests and were allowed to intervene.

After hearing, the Utilities Commission granted Greyhound's application, but with greater restrictions. The certificate authorizes Greyhound to operate through service between Raleigh and Charlotte via Asheboro over Highways 64 and 49, but "restricted from Asheboro to Charlotte to operations with closed doors and without authority to serve any intermediate points."

Carolina grounds its protests and appeal on its contentions that (1) Greyhound's application is barred by the lease agreement, and (2) public convenience and necessity does not require the granting of this authority to Greyhound.

Prior to the order in this case the through bus transportation between Raleigh and Charlotte had been over Carolina's northern route via Greensboro and Lexington, and Carolina's southern route via Sanford. Greyhound and Queen City's services were not in any real sense competitive. Greyhound's shortest route, controlled solely by it, was via Lexington, Winston-Salem and Statesville. Queen City had no service between Raleigh and Charlotte except in combination with Carolina or Greyhound. Carolina was anxious to retain the Raleigh-Charlotte traffic, and in the lease agreement Greyhound had promised not to compete with Carolina for intrastate traffic moving between Raleigh and Charlotte irrespective of the points of origin or destination.

It is Carolina's position that the lease agreement, solemnly executed by Greyhound and approved by the Commission, bars Greyhound from applying for the Raleigh-Charlotte authority. On the other hand Greyhound contends that it is void.

At the time of its execution in 1947, the lease agreement was approved by the Commission at the joint request of Carolina and Greyhound. The law encourages cooperation and agreements between common carriers respecting their service to the public. G.S. 62-121.64 (a). But the interest of the public is paramount and the Commission has the authority to supervise and regulate common carriers for the protection of the public interest. G.S. 62-121.48. Contracts between carriers affecting service to the public are subject to the Commission's regulatory authority. *Utilities Commission v. Motor Lines,* 240 N.C. 166, 81 S.E. 2d 404. A contract between public utilities, when formally approved by the Commission, is in effect an order of the Commission binding on each of the parties. *Power Co. v. Membership Corporation,* 253 N.C. 596, 603, 117 S.E. 2d 812. An order of the Commission is *prima facie* just and reasonable. G.S. 62-26.10. This applies to orders approving contracts of public utilities. *Utilities Commission v. Casey,* 245 N.C. 297, 96 S.E. 2d 8. And the Commission may at any time, upon notice to the public utility affected and after opportunity is afforded the affected utility to be heard, alter or amend any order made by it. G.S. 62-26.5. ". . . (I)n the absence of statutory authority, and in the absence of any additional evidence or a change in conditions, the Commission has no power to reopen a proceeding and modify or set aside an order theretofore made by it . . . where the order was made in pursuance of an agreement entered into by the parties to the proceeding." 73 C.J.S., Public Utilities, s. 56(d), p. 1135. The Commission may not arbitrarily or capriciously rescind its order approving a contract. It must appear that such rescission is made because of a change of circumstances requiring it in the public interest. *Chicago Housing Authority v. Illinois Com. Com'n.,* 169 N.E. 2d 268 (Ill. 1960); *Central Northwest B. Men's Ass'n. v. Illinois C. Com'n.,* 168 N.E. 890 (Ill. 1929).

The Commission correctly concluded that the lease agreement is not a bar to the institution and maintenance of this proceeding. The terms and conditions of the lease agreement are relevant matters to be considered upon the question of public convenience and necessity. And Greyhound has the burden of showing that public convenience and necessity require modification and rescission of the order approving the lease agreement, and the granting of the application for franchise authority.

Greyhound argues at great length that the lease agreement is in restraint of trade, violates G.S. 75-1, and is therefore void. The reason for strict regulation of public utilities is that they are either monopolies by nature or given the security of monopolistic authority for better service to the public. The public is best served in many circumstances where destructive competition has been removed and the utility is a regulated monopoly. "Whether there shall be competition in any given field and to what extent is largely a matter of policy committed to the sound judgment and discretion of the Commission. The Commission must maintain a reasonable balance to see that the public is adequately served and at the same time to see that the public and the public utilities involved are not prejudiced by the efforts which flow from excessive competition brought about by excessive services." 73 C.J.S., Public Utilities, s. 42, p. 1099; *Sonafelt v. Pennsylvania Public Utility Commission*, 103 A. 2d 442 (Pa. 1954). It could not be successfully maintained that the Commission, upon proper application therefor and after hearing, could not have entered a valid order, in a contested proceeding, to the same effect as the lease agreement. A contract between public utilities, approved by the Commission, is not violative of the anti-monopoly statute, G.S. 75-1, if the Commission could have lawfully made an order to the same effect upon application and after hearing in an adverse proceeding.

Carolina insists that Greyhound's application should have been dismissed because it is a collateral attack on the Commission's order approving the lease agreement. It is generally recognized that a valid determination made by an administrative agency in its judicial or quasi-judicial capacity is not subject to collaterial attack. 2 Am. Jur. 2d. Admnistrative Law, s. 493, p. 299. But whether Greyhound's application is technically a collateral attack on the Commission's order is of no material importance here. By statute, G.S. 62-26.5, the Commission is empowered to rescind, alter or amend any order made by it, upon notice to the public utility affected and after opportunity to be heard. There is no suggestion that Carolina did not have notice and full opportunity for hearing in the instant case, or that it did not understand and appreciate the full purport of the hearing. The effect of Greyhound's application is to allege that circumstances have changed and public convenience and necessity now requires the lease agreement to be modified and the franchise authority to be awarded to Greyhound. It was within the authority of the Commission to treat the application as a motion in the prior cause, and to modify the order ap-

proving the lease agreement. *Toomes v. Toomes,* 254 N.C. 624, 119 S.E. 2d 442. This the Commission apparently did. Carolina does not complain that it was taken by surprise.

We now come to the more difficult questions whether the Commission's findings of fact are supported by competent, material and substantial evidence and, if so, whether the findings are sufficient to show that public convenience and necessity requires the granting of the franchise authority to Greyhound.

". . . (W)hat constitutes 'public convenience and necessity' is primarily an administrative question with a number of imponderables to be taken into consideration, e.g., whether there is a substantial public need for the service; whether the existing carriers can reasonably meet this need, and whether it would endanger or impair the operations of existing carriers contrary to the public interest. Precisely for this reason its determination by the Utilities Commission is made not simply *prima facie* evidence of its validity, but *'prima facie just and reasonable.'* " *Utilities Commission v. Trucking Co.,* 223 N.C. 687, 690, 28 S.E. 2d 201; *Utilities Commission v. Ray,* 236 N.C. 692, 73 S.E. 2d 870. The doctrine of convenience and necessity is a relative or elastic theory. The facts in each case must be separately considered and from those facts it must be determined whether public convenience and necessity requires a given service to be performed or dispensed with. The convenience and necessity required are those of the public and not of an individual or individuals. *Utilities Commission v. Casey, supra.* "Necessity" means reasonably necessary and not absolutely imperative. *Utilities Commission v. R.R.,* 254 N.C. 73, 79, 118 S.E. 2d 21. "Any service or improvement which is desirable for the public welfare and highly important to the public convenience may be properly regarded as necessary." And if a new service is necessary, and if there are carriers already in the field, there is always the vital question (in determining convenience and necessity) whether the new service should be rendered by the existing carriers or by the new applicant. *Mulcahy v. Public Service Commission,* 117 P. 2d 298 (Utah 1941); 73 C.J.S., Public Utilities, s. 42, pp. 1099, 1100.

The Commission sets out in the findings of fact the various routes open to the public by bus between Raleigh and Charlotte, and the distances, schedules and travel time on each; also the routes available to the public at points on U. S. Highway 64 for travel to Charlotte and return, including distance, schedules and travel time. It is found that Greyhound proposes to operate five round trip schedules between Raleigh and Charlotte over the route in question "operating with closed doors between Asheboro and Charlotte." There are also the

following additional findings of fact (numbering ours): (1) "The services proposed by Greyhound will not materially impair or affect the services by Carolina or Queen"; (2) "Existing carriers cannot reasonably meet this public need" (for the services proposed by Greyhound); (3) granting of requested authority will not endanger or impair the operations of existing carriers contrary to the public interest; Carolina is hauling less that four passengers per trip for the entire trip between Charlotte and Raleigh, and 50 percent or more of these are interstate passengers; Queen City operates only one round-trip schedule per day over N. C. Highway 49 between Mount Pleasant and Asheboro; Greyhound requests authority over this route with closed doors; (4) Bus service over the route in question is inadequate and insufficient to meet the public need, and inadequate bus service over this route has resulted in the non-use of what bus service has been available and caused a public demand for improvement in the service; (5) Additional, faster, more adequate, more efficient and through bus service over the route in question is needed to meet the public convenience in addition to presently authorized and existing service; (6) Greyhound is fit, able and willing to render this service.

Without detailing here the voluminous evidence set out in the record, we conclude from our review thereof that there is competent, material and substantial evidence to support the Commission's findings. No one questions the fact that the route via Asheboro over U. S. Highway 64 and N. C. Highway 49 has been improved, the bus time between the two cities can be substantially decreased, and that adequate bus service over this route is necessary for public convenience. It is conceded that Carolina, Greyhound, and Queen City are each financially capable, and otherwise fit, able and willing to render the service. The difficult questions are: (1) Will the granting of the authority to Greyhound unreasonably impair the financial stability and efficient public service of Carolina and Queen City (*Utilities Com. v. Coach Co.,* 233 N.C. 119, 63 S.E. 2d 113) and (2) is it in the public interest that the service be rendered by Greyhound? Carolina has heretofore had no competition for through bus transportation between Raleigh and Charlotte, and its best revenue route has been the Raleigh-Charlotte route via Greensboro. Unquestionably the authority applied for by Greyhound will furnish competition. But the Commission finds in effect that the intrastate travel between these points and beyond is not of sufficient consequence to impair Carolina's financial position or its service. Furthermore, as we shall presently see, Carolina was also given authority over the same route, which will tend to minimize the competitive effect of Greyhound's franchise. It was concluded that

Queen City's service, one round-trip per day, is a small operation, and Greyhound's service over Queen City's route with closed doors will interfere very little with business Queen City has enjoyed. Perhaps the fact that led the Commission to grant the franchise to Greyhound rather than exclusively to Carolina or to Queen City is the showing of need for service between Charlotte and points on U. S. Highway 64. Greyhound already has the franchise along this highway, and through service from these points to Charlotte and return could not be rendered by Carolina or Queen City without a duplication of service along 64 from Asheboro to Raleigh. *Utilities Commission v. Coach Co., supra.*

Upon the same facts we might have reached a different result. But it is not for this Court to find the facts or to regulate utilities. *Utilities Commission v. Ray, supra.* "The decisions of the Utilities Commission must be within the authority conferred by the Act, yet the weighing of the evidence and the exercise of judgment thereon as to transportation problems within the scope of its powers are matters for the Commission." *Utilities Commission v. Motor Express,* 232 N.C. 180, 59 S.E. 2d 582.

Queen City contends that Greyhound's application should have been dismissed without a hearing for the reason that it proposed to duplicate Queen City's service over Highway 49. Queen City also contends that the Commission erred in granting Greyhound "closed door" authority over Queen City's route, because Greyhound did not apply for such authority at any time in the course of the proceeding.

It is true that Greyhound's application as filed sought to duplicate service on Queen City's route over Highway 49. It is also true that "no certificate shall be granted to an applicant proposing to serve a route already served by a previously authorized carrier unless and until the Commission shall find from the evidence that the service rendered by such previously authorized carrier is inadequate, and the certificate holder has been given reasonable time to remedy the inadequacy." G.S. 62-121.52(7).

The Commission did not grant the duplication of service requested by Greyhound. Instead, it granted only "closed door" authority over Queen City's route. G.S. 62-121.52(7) does not forbid authority to two or more carriers to traverse the same segment of a highway so long as they do not render duplicate service. The mere fact that the two carriers will use the same highway for a distance does not require a denial of the application. *Utilities Com. v. Coach Co., supra.*

The Commission need not approve or reject an application as submitted. It may attach to the certificate granted such reasonable terms,

conditions and limitations as the public convenience and necessity may require. G.S. 62-121.53. "Ordinarily, the procedure before such commission is more or less informal, and is not as strict as in civil cases, nor is it confined by technical rules; substance and not form is controlling." 73 C.J.S., Public Utilities, s. 49, p. 1115. In the proceeding before it the Commission is not confined to the immediate scope of the pleadings on file. It may enlarge the scope of the inquiry, and where the parties to be affected are before it, participate in the inquiry and make defense, they cannot complain of a departure from the pleadings. *Baltimore & O. R. Co. v. Public Service Commission,* 110 S.E. 475 (W. Va. 1922); *C. H. & D. Ry. Co. v. I.C.C.,* 206 U.S. 142. The authority granted Greyhound was less competitive to Queen City than that applied for. If Queen City was taken by surprise, the record does not disclose it.

As indicated above, the Commission granted Greyhound the certificate, with restrictions. The Commission declared: "To the extent that the contract (lease agreement between Carolina and Greyhound), its terms and conditions, are contrary and adverse to and in conflict with the provisions of this order they are vacated, voided, cancelled and declared null and of no effect." Carolina and Queen City appealed, and the Superior Court affirmed the Commission's order. In this, we find no error.

-II-

*Case No. 467.* On 27 September 1960 Carolina applied to the Commission for franchise authority from the junction of U. S. Highways 1 and 64, approximately two miles north of Apex, over U. S. Highway 64 to Asheboro, thence over N. C. Highway 49 to its junction with U. S. Highway 29, approximately six miles north of Charlotte, and return over the same route — "as an alternate route for operating convenience only, serving no intermediate points." Thus, Carolina applied for authority to operate with closed doors between Raleigh and Charlotte via Asheboro, seeking only point to point service over this route from Raleigh to Charlotte and return. It had previously had no franchise over the route described. Its purpose is to take advantage of the short route made available by the improvements on Highway 49, and to protect its Raleigh-Charlotte operations which it had previously enjoyed without serious competition.

Greyhound filed protest and intervened. After hearing, the Commission granted the application.

Greyhound contends that the application should have been dismissed for the reason that Carolina applied for an "alternate route for operating convenience only" and the route applied for does not qualify as an alternate route under the rules promulgated by the Commission.

According to the Commission's rule, an alternate route is "a designated highway or series of highways lying wholly within the State . . . over which a regular route motor carrier may operate in the interest of economy or convenience or to avoid congested areas . . . or other hazards on an authorized regular service route, deviating from a point on such authorized regular service route and returning at some other point on the same regular service route." [s. (b) (5) of Appendix of General Order B-4, promulgated 26 November 1958 pursuant to G.S. 62-121.60]. The route described in Carolina's application apparently does not comply with the foregoing rule for its termini connect with different service routes of Carolina.

Carolina agrees that the route described in its application is not the type of route referred to as an "alternate route" in the Commission's rule. But Carolina insists that, while the route will serve as an alternate route for its point to point service from Raleigh to Charlotte and return, its application is for a new service route for the operation of daily schedules between Charlotte and Raleigh in addition to the regular daily schedules in operation over its northern and southern routes. The application is filed on Commission's form M-1, pursuant to G.S. 62-121.52(b); applicant assumes the burden of showing public convenience and necessity; and proceedings are in conformity with G.S. 62-121.52. Regardless of the name given the proceeding, it is clear that the application is for franchise authority and not for alternate route authority, and the Commission so understood and dealt with the proceeding. Even if Carolina had sought alternate route authority under the Commission's rules, the power of the Commission is not restricted to the proceedings as commenced, but it may enlarge the scope of the inquiry beyond the issue raised by the pleadings where the parties to be affected are before the Commission, participate in the proceedings, have full opportunity to be heard, and are not misled as to the purpose of the hearing. 73 C.J.S. Public Utilities, s. 47, p. 1114. We do not understand that Greyhound contends it was taken by surprise.

It will be observed that franchise authority was also granted to Greyhound over this route, with closed door service only between Asheboro and Charlotte. The authority to Carolina is for closed door service for practically the entire route. "A traversing of the same high-

ways for certain distances by competing carriers may readily become necessary in the public interest and, in such an instance, more than one certificate may be granted, subject to such restrictions as will protect the authorized carrier in respect of that part of the highway to be traversed by both." *Utilities Com. v. Coach Co., supra.*

Among other things, the Commission found as a fact that "public convenience and necessity require the proposed service in addition to existing authorized transportation service and that applicant is fit, willing and able to properly perform the proposed service, and is solvent and financially able to furnish adequate service on a continuing basis." There is competent, material and substantial evidence to support this finding. The Charlotte-Raleigh service has historically been by Carolina's buses and routes, and Carolina has provided continuously the only intrastate motor bus service between these cities. This service has been the backbone of Carolina's operations in this State. The Charlotte-Raleigh operation has been the best in North Carolina as far as Carolina's passenger revenue is concerned. It has furnished revenues to support other operations. The shorter route via Asheboro will effect economies, reduce travel time, and increase bus travel. Granting of Carolina's application is necessary to protect the traffic now moving by Carolina between Charlotte and Raleigh, and to preserve to Carolina in the circumstances of new competition the passenger revenues essential to the maintenance of Charlotte-Raleigh service and service to other points. All these things the evidence tends to show.

It would seem that Greyhound is in poor position to oppose Carolina's application. The Commission granted similar authority to Greyhound on evidence which would have justified a denial. This gave Greyhound, for the first time, through service authority between Raleigh and Charlotte, over the shortest and most desirable route, and in direct competition with Carolina in a field that Carolina had occupied alone. It changed the competitive situation sharply in favor of Greyhound. The only possible protection for Carolina's position was the granting of its application.

From the order of the Commission allowing Carolina's application, Greyhound appealed. The Superior Court affirmed the Commission's order. In our opinion this result is proper.

-III-

*Case No. 466.* On 5 October 1960 Greyhound applied to the Commission for intrastate franchise authority on the route from Lexing-

ton over U. S. Highway 29 to Charlotte, combining this authority with the operation conducted by Greyhound between Winston-Salem and Lexington, and restricting the operation from Lexington to Charlotte against passengers whose entire ride is between Lexington and Charlotte or intermediate points.

The application was amended and finally Greyhound stipulated that "if any certificate is granted it will grant only authority to haul passengers from Winston-Salem or points beyond to Charlotte or points beyond and *vice versa*, without picking up or discharging any passengers, regardless of where originated, at any point between Winston-Salem or (and) Charlotte."

In final analysis Greyhound is asking for franchise authority for a service it has been rendering and may continue to render by virtue of the lease agreement between it and Carolina. It seeks only to set aside the lease agreement and to have the Commission grant it by certificate the same rights it has enjoyed by virtue of its contract.

The Commission found *inter alia* the following facts: (1) "Public convenience and necessity exists for and requires that the intrastate passenger service now being rendered by Greyhound between Lexington and Charlotte be continued; (2) The agreement or lease arrangement between Carolina and Greyhound . . . is not of such purport and substance as to be calculated to encourage and promote harmony among motor carriers of passengers; . . . (6) Greyhound should be granted authority to render this service under a franchise right of its own rather than under the existing lease arrangement or agreement."

It is conceded by all parties that public convenience and necessity requires the service that Greyhound has been rendering under the lease agreement, that it should be continued, and that Greyhound has the absolute right to continue the service under the terms of the lease agreement which were approved by the Commission.

However, the findings of fact do not support the conclusion that the lease agreement should be set aside and franchise authority be granted in lieu thereof. The only ground upon which the Commission undertakes to justify a revocation of its order approving the lease agreement is that the lease agreement "is not of such purport or substance as to be calculated to encourage or promote harmony among motor carriers of passengers," whatever that means. It is the policy of the law "to encourage and promote harmony among motor carriers of passengers," to be sure. G.S. 62-121.44; G.S. 62-121.48(3). However, there is no evidence tending to show, or explanation disclosing, how a certificate of the Commission of the same "purport and substance" as the lease agreement will better encourage and promote harmony be-

tween Greyhound and Carolina. Ordinarily a contract voluntarily made is more conducive to harmony that a judgment entered in an adverse proceeding. We can think of nothing which will effectively promote harmony between carriers when one is seeking to abrogate its solemn contract and take over business formerly enjoyed by the other. Moreover, the evidence does not show, and the Commission does not find, a change of conditions requiring, in the public interest, a rescission of the Commission's order approving the lease agreement. *Chicago Housing Authority v. Illinois Com. Com'n., supra.*

The Commission granted Greyhound's application and Carolina appealed. The Superior Court affirmed the Commission's order. We are of the opinion that the judgment should be reversed.

Case No. 465 — Affirmed.

Case No. 466 — Reversed.

Case No. 467 — Affirmed.