STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION AND UNITED LIMESTONE PRODUCTS, INCORPORATED, APPLICANT v. KENAN TRANSPORT COMPANY, EAST COAST TRANSPORT COMPANY, INC., PETROLEUM TRANSPORTATION, INC., O'BOYLE TANK LINES, INC., EAGLE TRANSPORT CORPORATION, PROTESTANTS

No. 7110UC30

(Filed 31 March 1971)

1. Utilities Commission § 3; Carriers § 2; Gas § 3— granting of contract carrier permit — delivery of LP gas — sufficiency of evidence

The Utilities Commission properly granted a contract carrier permit to an applicant who sought to carry liquified petroleum gas in eastern North Carolina, notwithstanding the protest of existing carriers that they could make deliveries of LP gas in the same territory upon 12-to-24 hours' notice, where the applicant offered evidence that, during the peak demands of the tobacco curing season, the applicant's prospective customers needed deliveries of LP gas within 12 hours, oftentimes sooner; that it was the customers' experience that three out of ten deliveries by existing carriers would be late; and that the applicant's equipment would be devoted solely to meeting the needs of its customers. G.S. 62-262 (i).

**2. Carriers § 2— contract carrier permit — requisites**

    An applicant for a permit as a contract carrier must show that one or more shippers or passengers have a need for a specific type of service that is not otherwise available by existing means of transportation. G.S. 62-31.

**3. Utilities Commission § 9— findings of fact**

    Findings of fact by the Utilities Commission are conclusive and binding when supported by competent, material, and substantial evidence in view of the entire record.

APPEAL by protestants from Order of North Carolina Utilities Commission entered 3 July 1970.

This proceeding was initiated by an application filed with the Commission by which applicant, United Limestone Products, Inc. (Limestone), seeks authority to transport liquefied petroleum gas (LPG) in bulk tank trucks as a contract carrier over irregular routes from a terminal at Apex, N. C., to the eastern North Carolina towns of Bridgeton, Pollocksville, Richlands, Jacksonville and Swansboro. A Protest and Motion for Intervention was filed by protestants all of whom are common carriers with authority to transport LPG in bulk in tank trucks in intrastate commerce in North Carolina.

In their Protest and Motion for Intervention, protestants alleged that the proposed service of Limestone did not conform with the definition of a contract carrier within the meaning of the North Carolina Public Utilities Act and the rules of the Utilities Commission in that the transportation requirements of LPG are not such as would require any special type of service or equipment not available through the protestants or any other authorized common carrier with LPG authority; that the proposed service of Limestone would unreasonably impair the efficient public service of the protestants and other existing common carriers of LPG and that the proposed contract carrier operation would be inconsistent with the public interest and the transportation policy as declared in the Public Utilities Act.

Pertinent evidence submitted at the hearing is summarized as follows: Five separate but commonly owned corporations (hereinafter called Jenkins Gas) are engaged in the business of buying and selling LPG in the areas of eastern North Carolina in which they are located, particularly the five towns named above. Most of the gas purchased and sold by these companies is transported by tank truck from the terminal facilities of the

major oil companies in Apex to the storage tanks owned by
each of the five. At present Martin Transport (Martin), a com-
mon carrier, which owns one tank truck that is suitable for
LPG transportation, uses it exclusively to carry the requirements
of the five corporations except during the peak seasons. The
major peak season is during July and August when tobacco
is cured in the area served by Jenkins Gas. At such times other
common carriers including rail have been used. Martin has
decided to discontinue the business of hauling LPG. The princi-
pals of Jenkins Gas have incorporated Limestone, a separate
corporation but having common stock ownership with that of
Jenkins Gas, the primary purpose of which is to buy the truck
of Martin and to enter into contracts with Jenkins Gas to carry
their major LPG requirements. The same person who has been
driving for Martin would be hired by and drive for Limestone.

There was testimony for Limestone showing that the offices
of the five Jenkins Gas Corporations ranged in distances from
92 to 130 miles from the terminal at Apex where the gas was
loaded onto the tank trucks; that the storage facilities at the
various branches of Jenkins Gas varied in capacity and that in
at least two locations the capacity was so small that during the
peak seasons they required almost constant refilling; and that
if propane gas was not available within a relatively short time
at any of the five different locations the Jenkins Gas customers
would go elsewhere. There was also evidence to indicate that
on occasions as little as three to four hours notice would be all
that could be given to a carrier to bring more gas. In addition
it was stated that during the peak seasons, when other common
carriers had been used, it was the experience of Jenkins Gas
that three out of every ten loads of LPG carried by the common
carriers other than Martin were late. Since competition in the
area of the Jenkins Gas operation is very keen it is necessary for
them to have a rapid refilling service assured, and Limestone
felt that this service could not be provided by protestants. Martin
had been hauling gas for Jenkins Gas exclusively, the Martin
truck had been available to them at any time, and during the
duration of this arrangement there had been no late deliveries.

Evidence for the protestants tended to show that they were
common carriers authorized to carry LPG within the State of
North Carolina; that several of protestants had carried gas for
Jenkins Gas during the peak seasons; that the Jenkins Gas
operation was very similar to that of certain other customers of

protestants. An officer of one of the protestants testified that it owned equipment designed to haul propane gas but that it could not keep such equipment utilized all year. There was testimony which indicated that protestants could haul gas to a customer within 12 to 24 hours after notice of a need for the gas was given. Service by the common carriers is on a first come first serve basis. One of the protestants indicated that it would like to enter into an arrangement with Jenkins Gas, allowed under the common carrier tariffs, whereby certain equipment would be "dedicated" exclusively to the use of Jenkins Gas. This service requires a minimum tender of $575 a week each week of the year regardless of whether gas hauling charges during the week equal that sum. If hauling charges exceed that amount in a given week then the shipper would pay the extra.

Both parties admitted that the business of hauling and selling LPG was very cyclical and one of the protestants stated that equipment which was necessary to handle demand for hauling it during the peak seasons was idle much of the year, because the equipment was unsuitable for other types of hauling. Protestants contended that the hauling of gas for Jenkins Gas was of a type that could be handled by a common carrier authorized to haul LPG.

The application for a contract carrier's permit was allowed and protestants appealed.

*Everette L. Wooten, Jr., for United Limestone Products, Inc. plaintiff appellee.*

*Edward B. Hipp and William E. Anderson for North Carolina Utilities Commission, plaintiff appellee.*

*Allen, Steed & Pullen by Thomas W. Steed, Jr., for defendant appellants.*

BRITT, Judge.

[1] Protestants contend that Limestone failed to meet the statutory criteria and the rules and regulations of the Utilities Commission in its application for a contract carrier permit. We disagree with the contention.

G.S. 62-262(i) sets forth the criteria to be used by the Utilities Commission in determining whether a permit is to be granted authorizing an applicant to operate as a contract car-

rier. This section states that the Commission shall give due consideration to:

"(1) Whether the proposed operations conform with the definition in this chapter of a contract carrier,

"(2) Whether the proposed operations will unreasonably impair the efficient public service of carriers operating under certificates, or rail carriers,

"(3) Whether the proposed service will unreasonably impair the use of the highways by the general public,

"(4) Whether the applicant is fit, willing and able to properly perform the service proposed as a contract carrier,

"(5) Whether the proposed operations will be consistent with the public interest and the policy declared in this chapter; and

"(6) Other matters tending to qualify or disqualify the applicant for a permit."

Rule R2-10 of the North Carolina Utilities Commission, adopted pursuant to G.S. 62-31, requires that the proposed service conform to the definition of a contract carrier as defined in G.S. 62-3 (8) which states that a " 'contract carrier by motor vehicle' means any person which, under individual contracts or agreements, engages in the transportation * * * by motor vehicle of persons or property in intrastate commerce for compensation * * * ." Rule R2-15 (b) of the Commission provides as follows:

"(b) If the application is for a permit to operate as a contract carrier, proof of a public demand and need for the service is not required; however, *proof is required that one or more shippers or passengers have a need for a specific type of service not otherwise available by existing means of transportation,* and have entered into and filed with the Commission, prior to the hearing or at the time of the hearing, a written contract with the applicant for said service, which contract shall provide for rates not less than those charged by common carriers for similar services." (Emphasis added.)

[2] Under the quoted rule it appears that an applicant for a permit as a contract carrier must show that one or more

shippers or passengers have (1) a need for (2) a specific type of service and (3) that it is not otherwise available by existing means of transportation.

[1]     There is sufficient evidence in the record to indicate that due to Jenkins Gas' shortage of storage space it needed a hauling service that could deliver LPG in less than 12 hours; that the equipment that Limestone contemplated buying from Martin was to be used solely for the benefit of Jenkins Gas thereby meeting the test for a specific type of service; and that from the testimony of a representative of protestants it was evident that protestants would be unable to make delivery to Jenkins Gas within the time period needed. It is apparent from the evidence which indicates the cyclical nature of the gas business that a "dedication" of certain equipment to Jenkins Gas' use by a common carrier is not the answer to its needs; under that arrangement Jenkins Gas would have to pay $575 a week for a service that it would be unable to use for a large part of the year. The use of "dedicated" equipment is not mandatory and does not preclude Limestone from complying with other provisions of the act and receiving a permit as a contract carrier. There was sufficient proof that "one or more shippers or passengers have a need for a specific type of service not otherwise available by existing means of transportation." The Commission made the other statutory findings of fact necessary for the granting of the permit and the findings are supported by competent evidence.

Protestants strongly rely on the case of *Utilities Commission v. Petroleum Transportation, Inc.*, 2 N.C. App. 566, 163 S.E. 2d 526 (1968). The case at hand is clearly distinguishable. In the cited case the applicant for a permit to operate as a contract carrier for a specified shipper offered no proof that the shipper had a need for a specific type of service not otherwise available by existing means of transportation; applicant's evidence showed that the only purpose in obtaining the permit was to increase the profits of the applicant; this court held that a finding by the Utilities Commission that the applicant met the test of a contract carrier was not supported by the evidence and the permit was improperly granted. In the case at hand the *need* for the specialized services by Limestone was shown.

[3]     It is well established that the Commission's findings of fact are conclusive and binding when supported by competent, material, and substantial evidence in view of the entire record

as submitted. *Utilities Commission v. Carolina Coach Company,* 269 N.C. 717, 153 S.E. 2d 461 (1967). We hold that there was sufficient evidence to support the findings of the Utilities Commission in this case and the order appealed from is

Affirmed.

Judges CAMPBELL and HEDRICK concur.