STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION AND KENOSHA AUTO TRANSPORT CORPORATION (APPLICANT) v. J. D. McCOTTER, INC. (PROTESTANT)

No. 7210UC542

(Filed 22 November 1972)

1. Carriers § 2— application for contract carrier permit — proof required

To be entitled to a permit to operate as a contract carrier, an applicant is not required to show a public demand and need for the proposed service as is required of an applicant for a certificate of

Utilities Comm. v. McCotter, Inc.

authority to operate as a common carrier, but must show that one or more shippers have a need for a specific type of service not otherwise available by existing means of transportation. Utilities Commission Rule R2-15(b).

**2. Carriers § 2— contract carrier permit — needs of boat manufacturer**

The Utilities Commission did not err in determining that a boat manufacturer has a need for a specific type of service not otherwise available by existing means of transportation and in granting applicant the authority to operate as a contract carrier for the boat manufacturer from its plant in High Point to New Bern and Morehead City.

**3. Carriers § 2— contract carrier permit— effect on common carrier — public interest**

The fact that protestant might reasonably expect to receive a portion of a boat manufacturer's transportation business if applicant is denied authority to operate as a contract carrier for the boat manufacturer does not compel a determination that the grant of such authority will unreasonably impair the efficient service of protestant as a common carrier or that it is inconsistent with the public interest.

**4. Carriers § 2; Utilities Commission § 3— application for common carrier authority — grant of contract authority**

The Utilities Commission had authority to grant contract authority to the applicant although common carrier authority had been requested in the application. Utilities Commission Rule R2-10(a).

**5. Carriers § 2; Utilities Commission § 3— hearing on application for carrier authority — departure from pleadings**

Where the parties to be affected are before the Utilities Commission, participate in the hearing and make defense, they cannot complain of a departure from the pleadings.

**6. Carriers § 2— fitness to perform as contract carrier — previous transportation without required intrastate authority**

Applicant's previous unlawful transportation of boats from the manufacturer's plant in High Point to New Bern and Morehead City under the mistaken belief that the transportation was in interstate commerce and that no intrastate authority was needed did not require the Utilities Commission to find that the applicant is unfit to perform as a contract carrier in this State.

Judge VAUGHN dissents.

APPEAL by protestant from an order of North Carolina Utilities Commission in Docket No. T-1581, entered 21 March 1972.

Kenosha Auto Transport Corporation (applicant) filed application with the Utilities Commission on 6 October 1971 seeking a certificate to operate as an intrastate common carrier

for  the  purpose  of  transporting  boats  and  boat  accessories,
attachments  and  parts  when  moving  with  mixed  loads  with
boats.  Exhibits  incorporated  in  the  application  indicate  appli-
cant  owns  288  boat  trailers,  operates  408  tractors,  and  proposes
to  establish  1  tractor  and  8  trailers  at  High  Point,  or  more  if
required;  also,  that  applicant  has  a  net  worth  of  approximately
$7,000,000.00.

J.  D.  McCotter,  Inc.,  filed  timely  protest  and  was  permitted
to  intervene.  At  hearings  held  pursuant  to  notice,  applicant
offered  evidence  tending  to  show  the  following:

Applicant  has  been  in  business  as  a  specialized  carrier  since
1932.  It  is  principally  engaged  in  the  transportation  of  cars,
trucks,  boats  and  related  products  under  authority  issued  by
the  Interstate  Commerce  Commission  for  interstate  hauling
throughout  the  continental  United  States.  Since  1960,  applicant
has  serviced  the  Hatteras  Yacht  Company  (now  a  division  of
North  American  Rockwell  Corporation)  by  transporting  boats
from  the  Hatteras  plant  in  High  Point  to  New  Bern  and  More-
head  City.  Since  the  ultimate  destination  of  these  boats  was
understood  to  be  points  outside  this  State,  applicant  considered
the  transportation  to  be  interstate  commerce.  When  this  inter-
pretation  of  the  law  was  questioned  by  the  Utilities  Commission,
applicant  immediately  followed  the  Commission's  advice  and
applied  for  intrastate  authority.  The  Hatteras  boat  plant  in
High  Point  produces  about  300  units  a  year,  including  some
which  extend  more  than  50  feet  in  length.  Applicant  makes
available  to  the  High  Point  plant  6  specialized  trailers  which
are  suitable  for  transporting  the  various  boat  models  produced
there.  It  takes  several  trailers  to  accommodate  the  volume  of
shipments  that  move  between  High  Point  and  New  Bern  and
Morehead  City.  While  one  boat  is  in  transit,  others  are  "being
moved."  Hatteras  supports  the  application.  One  of  its  officers
testified  that  ".  .  .  [w]e  could  not  operate  unless  we  had  at
least  the  number  of  trailers  and  other  equipment  that  we  pres-
ently  have  at  our  disposal  from  Kenosha.  Our  agreement  with
them  is  that  we  will  use  their  equipment  if  they  will  provide
all  the  equipment  that  we  need."  He  also  stated  that  Kenosha's
service  has  been  satisfactory  and  that  to  his  knowledge  no  one
has  solicited  the  hauling  now  being  done  by  Kenosha;  further,
that  while  his  company  has  not  attempted  to  determine  what
companies  might  have  intrastate  authority,  "[a]  supplier  norm-
ally  comes  to  us."

The sole intervenor, J. D. McCotter, Inc., offered the testimony of its owner, J. D. McCotter. McCotter operates out of Washington, N. C. He testified in substance as follows: His company has had intrastate authority for the transportation of boats since 17 June 1969. It owns 4 trailers and several tractors. The trucks have printed on the side "J. D. McCotter, Building Supplies and Concrete Products." McCotter has been a dealer for Chris-Craft boats for over 25 years. At first other carriers were used, but ". . . we bought our own equipment because we couldn't get service in the remote area we are in. It took ten days or 2 weeks so our customers could get better service we bought our own equipment." In addition to being in the boat business, McCotter owns a ready-mixed concrete company, a farm, a marina, and he hauls lumber and other commodities. Upon cross-examination he stated: "I do not think it should be the information of Hatteras to know the number of boats that I sell in a year's time. We have our boats [sic] that we can haul it on, we have equipment to do it with, we can delay our business, but we cannot delay the customers." McCotter contended that he had solicited intrastate hauling business from Hatteras on several occasions. He also stated: "I have 2 trailers that could handle most of the boats of Hatteras. That is 40 feet and up. I have 3 that could haul from 40 feet down. I do not have a trailer at this time that could haul a boat in the 50 foot class." He went on to say that his company has equipment sitting idle and that any additional equipment which the company might need to service Hatteras could be acquired.

The hearing examiner recommended an order denying the requested authority. Applicant filed exceptions to the order and the matter was set for oral argument before the Full Commission. The Commission issued its order denying the requested authority, but granting applicant authority to operate as a contract carrier for Hatteras from its plant in High Point, North Carolina to New Bern and Morehead City. The protestant appealed.

*Edward B. Hipp, Commission Attorney, and William E. Anderson, Assistant Commission Attorney, for the North Carolina Utilities Commission.*

*York, Boyd and Flynn by A. W. Flynn, Jr., for applicant appellee.*

*Vaughan S. Winborne for protestant appellant.*

GRAHAM, Judge.

[1] A common carrier by motor vehicle may be defined as a person who is not exempted from regulation under the provisions of G.S. 62-260, and who holds himself out to the general public to engage in transportation of persons or property for compensation. G.S. 62-3 (7). A contract carrier is a person who is not exempted from regulation under the provision of G.S. 62-260, and who, under agreement with another person, and with such additional persons as may be approved by the Utilities Commission, engages in the transportation, other than transportation as a common carrier, of persons or property in intrastate commerce for compensation. G.S. 62-3 (8). To be entitled to a certificate of authority to operate as a common carrier, the applicant has the burden of showing, among other things, that public convenience and necessity require the proposed service in addition to existing authorized transportation service. G.S. 62-262 (e) (1). To be entitled to a permit to operate as a contract carrier, an applicant does not have to show a public demand and need for his service. He must show, however, "that one or more shippers or passengers have a need for a specific type of service not otherwise available by existing means of transportation. . . . " Rule R2-15 (b) of the North Carolina Utilities Commission, adopted pursuant to G.S. 62-31; *Utilities Comm. v. Transport Co.*, 10 N.C. App. 626, 179 S.E. 2d 799; *Utilities Comm. v. American Courier Corp.*, 8 N.C. App. 358, 174 S.E. 2d 814, *cert. denied*, 277 N.C. 117; *Utilities Comm. v. Petroleum Transportation, Inc.*, 2 N.C. App. 566, 163 S.E. 2d 526.

[2] The principal question presented on this appeal is whether the Commission erred in determining, as required by its Rule R2-15 (b), that Hatteras has a need for a specific type of service not otherwise available by existing means of transportation. We hold that it did not. A special type of equipment is required for the transportation of the boats and accessory parts manufactured by Hatteras. At least 6 trailers capable of this special type of hauling must be dedicated exclusively to Hatteras's disposal; otherwise, as a Hatteras officer testified, "We could not operate." A contract carrier serves only the other party to the contract; whereas, a common carrier must serve the public generally. It is apparent from the evidence that contract carrier service, and not common carrier service, is the answer to Hatteras's special needs. See especially: *Utilities Commission v. Transport*, 260 N.C. 762, 133 S.E. 2d 692; and

*Utilities Comm. v. Transport Co., supra.* The constant availability of adequate equipment, properly designed for Hatteras's particular needs, is essential to the welfare of its business. Insofar as its North Carolina operation is concerned, applicant has no duty to the public that will compete with its contractual duty to make this needed equipment constantly available to Hatteras and to otherwise service Hatteras's special shipping needs.

Protestant argues that *Utilities Comm. v. Petroleum Transportation, Inc., supra,* is directly on point. That case is easily distinguishable from the case at hand. The applicant there not only failed to show that the shipper had a need for a specific type of service not otherwise available by existing means of transportation, but offered evidence that adequate transportation was available and that the only purpose in applying for a permit was to increase the profits of applicant.

Protestant challenges the Commission's findings "that the contract carrier authority and operations favorably considered herein will be consistent with the public interest . . . " and "will not unreasonably impair the efficient service of carriers operating under certificates or rail carriers." Protestant's basic argument is that these findings are inconsistent with evidence which tends to show that it has idle equipment which is suitable for use in handling Hatteras's shipping needs. However, protestant's evidence also tends to show that even if all the equipment which it now owns were dedicated exclusively to the use of Hatteras, the equipment would not be adequate to service all of Hatteras's needs. It is further noted that at least a portion of protestant's equipment is used in the transportation of its own boats, an enterprise found by the Commission to be competitive with Hatteras, and a portion of its equipment is also used for transportation of lumber and other materials. Moreover, protestant, as a common carrier, has a duty to serve the public generally. To dedicate all or most of its equipment exclusively to the use of a single shipper would be inconsistent with this duty.

[3] It is true that protestant might reasonably expect to receive a portion of Hatteras's business should contract authority be denied to applicant. This fact alone, however, does not compel a determination that the efficient service of protestant as a common carrier will be unreasonably impaired. "There is no public policy condemning competition as such in

the field of public utilities; the public policy only condemns unfair or destructive competition." *Utilities Comm. v. Coach Co.*, 261 N.C. 384, 389, 134 S.E. 2d 689, 694. Neither protestant, nor any other intrastate carrier, has handled any of the shipping which applicant will handle under the contract authority granted herein. Consequently, a continuation of applicant's operations under proper authority could hardly constitute unfair or destructive competition with respect to protestant or other carriers.

Protestant's argument that the Commission's action is inconsistent with the public interest seems to be based primarily upon the contention that the granting of contract authority to applicant is unfair to protestant. As previously noted, if the authority were withheld, Hatteras might turn to protestant for intrastate carrier service. Presumably, this would be in protestant's economic interest. However, the interest of a single carrier and the interest of the public are not necessarily one and the same. Certainly it is in the public's interest for this State's manufacturers to have available the service of carriers which are equipped to efficiently handle their particular shipping requirements. Here the Commission determined that the issuance of contract authority to applicant was the only effective means of assuring that Hatteras would have adequate transportation service available to meet its specific needs. This determination is supported by the evidence and supports the Commission's finding that the contract authority granted is consistent with the public interest.

[4] Protestant questions the authority of the Commission to grant contract authority when common carrier authority was requested in the application. Rule R2-10(a) of the Commission provides:

"Unless the applicant elects to accept only the type of authority set out in the application, the Commission will grant such authority as the evidence shows the applicant is entitled to receive; that is to say, if the applicant has misconceived the nature of his proposed operation, or has misconstrued the meaning of terms used in his application, and has applied for a certificate to operate as a common carrier when the application should have been for a permit to operate as a contract carrier, or vice versa, the Commission will disregard the form of the application and grant

such authority within the scope of the application as the applicant is entitled to receive upon the facts."

[5]   It is well established that the procedure before the Commission is more or less informal and that substance and not form is controlling. *Utilities Comm. v. Coach Co.* and *Utilities Comm. v. Greyhound Corp.*, 260 N.C. 43, 132 S.E. 2d 249; *Utilities Commission v. Telephone Co.*, 260 N.C. 369, 132 S.E. 2d 873; *Utilities Commission v. Area Development, Inc.*, 257 N.C. 560, 126 S.E. 2d 325. Thus, where the parties to be affected are before the Commission, participate in the hearing and make defense, they cannot complain of a departure from the pleadings. *Utilities Comm. v. Coach Co., supra.* All of the evidence presented was directed toward the needs of a single shipper and the abilities of applicant and protestant to service these individual and specialized needs. Regardless of the name given the proceeding, the operation proposed in the hearing was in the nature of a contract operation rather than that of a common carrier operation. In our opinion, no prejudice could have resulted to protestant as a consequence of the mislabeling of the application.

[6]   Protestant says the Commission erred in failing to find that applicant knowingly engaged in unauthorized and unlawful transportation of boats in North Carolina for several years before filing its application.

Applicant admits that since 1960 it has transported from High Point to New Bern and Morehead City boats destined for further movement to points outside the state. It argues that when this operation began, it was subject to regulation as interstate commerce. See: Hafner and Hanson Common Carrier Application, 69 M.C.C. 581; Eldon Miller, Inc., Extension— Illinois, 63 M.C.C. 313; Dora Motor Carrier Operations Within Arizona, 48 M.C.C. 171; Bisceglia Contract Carrier Application, 34 M.C.C. 233; and Roethlisberger Transfer Co. Ext.—Frankenmuth, Mich., 32 M.C.C. 709. Several years later, the Interstate Commerce Commission reversed its previous rulings to this effect, Motor Transportation of Property Within A Single State, 94 M.C.C. 541, and its decision was ultimately affirmed by the Supreme Court of the United States. *Pennsylvania Railroad Co. v. United States,* 242 F. Supp. 890 (E.D. Pa. 1965), *aff'd mem.* 382 U.S. 372 (1966). Applicant further argues that it was not aware of this change in the law until its operation was questioned by the North Carolina Utilities Commission. At that time,

applicant immediately furnished the Commission with the details of its operation, and when the Commission questioned the legality of the operation, applicant immediately filed application for intrastate authority. No attempt was ever made by applicant to conceal its activities in this State. All of its vehicles used in the intrastate operation were licensed in this State and special permits were obtained from the North Carolina Department of Motor Vehicles to move the boats over this State's highways.

The Commission obviously considered evidence of applicant's previous illegal operations in the light of the explanations offered. A finding was made that applicant is *fit,* willing and able to perform a contract service. In our opinion, applicant's concessions regarding its past intrastate operations did not require the Commission to find that it is *unfit* to perform as a contract carrier in this State. There is plenary evidence to support the Commission's finding of fitness and the finding will not be disturbed.

Protestant has presented other contentions which are not discussed. These contentions have nevertheless been reviewed and found to be without merit.

Affirmed.

Judge HEDRICK concurs.

Judge VAUGHN dissents.