STATE OF NORTH CAROLINA Ex Rel., UTILITIES COMMISSION AND CONTRACT TRANSPORTER, INC. v M.L. HATCHER PICKUP & DELIVERY SERVICES, INC.

No. 7910UC750

(Filed 1 July 1980)

1. **Carriers § 2.7– contract carrier authority – sufficiency of proof**

   An applicant for authority to operate as a contract carrier under contract with Reynolds Metal Company to transport metal containers between the Reynolds Plant in Salisbury and warehouses in this State to all intrastate points met its burden under NCUC Rule R2-15(b) of proving (1) that Reynolds has a need for a specific type of service and (3) that such service is not otherwise available by existing means of transportation where there was evidence tending to show that the container industry is very competitive and Reynolds needs a carrier with statewide authority; specialized equipment and a carrier with expertise in handling such equipment are necessary to transport the containers; Reynolds needs a carrier which can dedicate equipment to its exclusive use for extended periods of time; protestant common carrier does not have statewide authority and is thus incapable of furnishing the required service; and the type of dedication of equipment which Reynolds needs is not consistent with the concept of common carriage such that protestant can provide the needed service.

2. **Carriers § 2.7– contract carrier permit – effect on common carrier**

   The fact that the grant of authority to applicant to operate as a contract carrier for a can manufacturer will result in denying protestant common carrier the future opportunity to transport the manufacturer's cans does not compel a determination that the grant of such authority will unreasonably impair the efficient service of protestant as a common carrier within the meaning of G.S. 62-262(i).

APPEAL by protestant from Final Order of the Utilities Commission in Docket No. T-1672, Sub. 2 entered 10 April 1979. Heard in the Court of Appeals 28 February 1980.

This is an appeal from an order of the Utilities Commission approving the application of Contract Transporter, Inc. for contract carrier authority.

On 16 May 1978 Contract Transporter, Inc. (CTI), an authorized motor carrier, filed an application with the Utilities Commission seeking authority to operate as a contract carrier under contract with Reynolds Metal Company to transport metal containers and container ends between the Reynolds Metals Company (Reynolds) can plant near Salisbury, North Carolina, and warehouses in this state to all intrastate points. On 7 June 1978, M.L. Hatcher Pickup and Delivery Services, Inc. (Hatcher) of Greensboro filed a Protest and Motion for Intervention in which it stated that it is an irregular route common carrier of property by motor vehicle operating intrastate under a certificate issued by the Commission, that it is authorized to transport the items referred to in CTI's application and between the points referred to therein, and that the proposed service does not conform to the definition of a contract carrier under G.S. 62-262(i) and Rule R2-15(b) of the Commission. The Commission granted protestant's motion for intervention on 16 June 1978.

At a hearing before a hearing examiner held on 17 August 1978, applicant CTI presented evidence as follows:

During the period February through April 1978 Reynolds began negotiating with various carriers for transportation services for its newly constructed can manufacturing facility in Salisbury, North Carolina, which was scheduled to begin production in December 1978. The facility was designed to produce a wide variety of metal containers, including the 12-ounce beer and beverage container. Because of the light weight and the bulk of the product, the practice in the industry is to ship the metal containers in "standard packs," layers of containers which are secured by picture frame-type holders and packed on pallets 44 inches by 56 inches. The transportation of these pallets requires the use of trailers at least 45 feet in length with inside and door opening minimum heights of 110 inches, swing-out doors, square noses, and straight floors without steps. Roy H. Grabman, Division Manager of Transportation and Ware-

housing for the Can Division of Reynolds, testified that many customers require delivery in trailers equipped with mechanically self-unloading roller devices which increase unloading efficiency and facilitate the distribution of cans within the customers' plants.

At the time of the negotiations, Reynolds was seeking, for both competitive and business reasons, a carrier which could not only provide the necessary equipment, but which could also furnish 24-hour-a-day operation directly from plant or warehouse locations to consignees and drivers trained in handling metal containers, and which could station equipment close to the plant to cover the contingency of short-notice movements. As the witness for Reynolds testified, "[i]f we cannot provide this type of service, our competitors certainly will."

At the time of the negotiations, neither the applicant nor the protestant had the necessary equipment to service Reynolds, although both companies represented that they could obtain it. Both submitted quotations to Reynolds. By late May 1978 applicant had obtained the special trailers and was operating under temporary emergency authority from the Interstate Commerce Commission to transport Reynolds containers received at a warehouse in Greensboro from interstate shipments to Miller Brewing Company in Eden. When protestant's vice-president contacted Reynolds concerning the status of its quotations, he learned that Reynolds intended to support the applicant for intrastate contract carrier authority.

On 12 May 1977 Reynolds and applicant entered into a proposed contract for intrastate service which provides that applicant transport Reynolds's containers, "to and from points in the State of North Carolina at such times, on such schedules, and to such destinations as may from time to time be designated to REYNOLDS." Reynolds made the decision to contract with CTI based upon applicant's greater experience in handling containers, its drivers' experience in operating the unloading system, and its ability to spot equipment at the Salisbury plant for short notice movements and to transport to customers throughout the state. Although at the time of the hearing Reynolds's only customers in North Carolina were the Shasta bottling

plant in Charlotte and Miller Brewing Company in Eden, Reynolds produced a list of thirteen other potential customer locations throughout the state. Witness Grabman testified that a carrier with statewide authority such as applicant was needed because Reynolds was unable to foresee when or where new sales would be made, and because it would be necessary at times to lease warehousing space on short notice in various locations in the state from which the carrier can deliver to customers.

The Vice-President of protestant Hatcher offered testimony as follows: Protestant is an irregular route common carrier holding authority for the transportation of general commodities, "except those requiring special equipment," over irregular routes between all points in thirty-seven counties, as well as between all points within a radius of seventy-five miles of Eden, and between Eden and Charlotte. That general authority would permit protestant to transport Reynolds's products from Salisbury to Eden and from Salisbury to Charlotte by way of Eden. Of the thirteen potential geographic customer locations listed by Reynolds, protestant would be able to serve all but five. Protestant can obtain the necessary equipment, and although its terminals are not open twenty-four hours a day, they have answering services which notify persons on call of the shipper's needs. Protestant would be willing to spot equipment at the Reynolds plant in Salisbury. At the time of the hearing, two of protestant's drivers had received instruction in handling the rollerbed equipment, although none of the drivers had actual experience.

Following the hearing, the hearing examiner filed a Recommended Order Denying Contract Carrier Authority based on the conclusion that protestant could amply meet all of Reynolds's needs and that the grant of authority to applicant would detrimentally affect protestant. On appeal to the full Utilities Commission, the Recommended Order was set aside. The Commission, upon findings, of fact, concluded that applicant had met the burden of showing need for contract carrier service and that applicant's proposed operations conformed to the definition of a contract carrier under G.S. 62-3(8). From the Final Order granting the Application of CTI for contract carrier

authority, protestant appealed.

*Bailey, Dixon, Wooten, McDonald & Fountain by J. Ruffin Bailey and Ralph McDonald for protestant-appellant.*

*Allen, Steed and Allen by Thomas W. Steed, Jr. and Noah H. Huffstetler III for applicant-appellee.*

PARKER, Judge.

G.S. 62-3(8) defines a "contract carrier by motor vehicle" as "any person which, under an individual contract or agreement with another person and with such additional persons as may be approved by the Utilities Commission, engages in the transportation other than [transportation by common carriers], by motor vehicle of persons or property in intrastate commerce for compensation . . . " Under G.S. 62-262, no carrier may transport property in intrastate commerce unless that person has applied for and obtained a certificate or permit. Subsection (i) of G.S. 62-262 specifies what the Utilities Commission must consider before granting a permit to a contract carrier:

> If the application is for a permit, the Commission shall give due consideration to:
>
> (1) Whether the proposed operations conform with the definition in this chapter of a contract carrier,
>
> (2) Whether the proposed operations will unreasonably impair the efficient public service of carriers operating under certificates, or rail carriers,
>
> (3) Whether the proposed service will unreasonably impair the use of the highways by the general public,
>
> (4) Whether the applicant is fit, willing and able to properly perform the service proposed as a contract carrier,
>
> (5) Whether the proposed operations will be consistent

Utilities Commission v. Delivery Services

with the public interest and the policy declared in this Chapter, and

(6) Other matters tending to qualify or disqualify the applicant for a permit.

Pursuant to its rulemaking powers under G.S. 62-31, the Utilities Commission has promulgated NCUC Rule R2-15(b) establishing the burden of proof for an applicant seeking contract carrier authority:

If the application is for a permit to operate as a contract carrier, proof of a public demand and need for the service is not required; however, *proof is required that one or more shippers or passengers have a need for a specific type of service not otherwise available by existing means of transportation,* and have entered into and filed with the Commission with a copy to the Public Staff prior to the hearing or at the time of the hearing, a written contract with the applicant for said service, which contract shall provide for rates not less than those charged by common carriers for similar service." (emphasis added).

Unless the requirements of both G.S. 62-262(i) and Rule R2-15(b) are met, the Commission may not grant the authority sought. NCUC Rule R2-10(b). Protestant contends on appeal in the present case that the applicant failed to meet its burden under both G.S. Chap. 62 and the Commission rules in that it did not show the need for a specific type of service, the unavailability of the needed service from existing carriers, or the absence of detrimental effect on common carriers.

[1] In support of its contention that applicant did not carry its burden of showing the need for a specific type of service, protestant challenges the full Commission's findings of fact that Reynolds needs a carrier with statewide authority on the grounds that the findings of Reynolds's need are unsupported by competent, material, and substantial evidence in view of the entire record as submitted. It is well established that if the findings of the Utilities Commission are so supported, they are conclusive and binding upon the appellate court. *Utilities Com-*

*mission v. Coach Company*, 269 N.C. 717, 153 S.E. 2d 461 (1967). The record discloses that the container industry is highly competitive and that Reynolds must be in a position to provide services comparable to those provided by its competitors. Although at the time of the hearing Reynolds had only two actual North Carolina customer locations, Charlotte and Eden, and the Division Manager of Reynolds's Can Division, Roy Grabman, testified that Reynolds had no present plans to establish warehouses at any specific point in North Carolina, Grabman also testified as follows:

> The demand for metal cans is extremely volatile and varies with the seasons and the weather. Our Salisbury plant will operate three shifts throughout the year, and will warehouse cans produced during the cooler months when demand is relatively low. At the present time, we operate a warehouse at Greensboro, North Carolina, and we anticipate the storage space for considerable number of cans will be available at our Salisbury plant. We also anticipate that from time to time, we will need to lease warehouse space in other locations in the State. Such warehouse locations are usually established on relatively short notice, and the actual location will be dependent on several factors, such as the availability of warehouse space, its proximity to our customers' locations, its costs, and its suitability for storing cans. Since we cannot foretell when or where new sales will be made or the locations of future warehousing operations, we need a carrier who can pick up and deliver shipments at any point in the State of North Carolina.

This testimony, along with evidence of the competitive nature of the container industry, is amply sufficient to support the Commission's finding of Reynolds's statewide need. To limit the scope of Reynolds's needs to its immediate geographic customer locations would be to ignore the realities of the marketing strategy necessary to Reynolds's business.

Protestant next contends that even if the Commission's findings of statewide need are supported by competent, material and substantial evidence, that need is not the type of "specific need" contemplated by NCUC Rule R2-15(b). This conten-

tion ignores the fact that the Commission did not rely solely on Reynolds's geographic requirement, but rather considered it as merely one factor along with Reynolds's other special needs. The Commission's order contained extensive findings of fact concerning the specialized equipment necessary to transport Reynolds's containers, the need for a carrier with expertise in handling such specialized equipment, and the need for dedication of equipment to the exclusive use of Reynolds for extended periods of time. This Court has in the past shown deference to the Commission's determination that a need for a specific type of service justifies the grant of contract carrier authority. In *Utilities Comm. v. Transport Co.*, 10 N.C. App. 626, 179 S.E. 2d 799 (1971), the Court held that the applicant for a contract carrier permit had met its burden of proof under G.S. 62-262(i) and NCUC Rule R2-15(b) where the evidence showed that the shipper, a buyer and seller of gas, required a carrier that could deliver liquified petroleum gas within twelve hours and that the permit applicant intended to devote equipment solely for the benefit of the shipper. Viewing the Final Order of the Commission in this case in its entirety, it is manifest that the applicant met its burden of showing that Reynolds has a need for a specific type of service.

The question remains, however, whether the applicant also met its burden under NCUC Rule R2-15(b) of showing that the specific type of service is not otherwise available by existing means of transportation and under G.S. 62-262(i) of showing that its proposed operations will not unreasonably impair the efficient public service of common carriers. Protestant has assigned error to the Commission's finding of fact that "[t]he Protestant and other existing carriers in North Carolina are unable or unwilling to provide the service and the type of equipment that Reynolds Metals needs." It is undisputed that at the time of the hearing protestant did not own any trailers equipped with mechanically self-unloading rollerbed systems such as Reynolds requires, although it was leasing one such trailer and had ordered five more at a cost of $125,000.00. It is also undisputed that Reynolds needs a shipper which can dedicate equipment to its exclusive use. The Commission found that the contract between applicant and Reynolds provides for the dedication of specific pieces of motor vehicle equipment to the exclu-

sive use of Reynolds, and that this provision was inconsistent with the concept of common carriage. Although protestant contends that a tariff exists providing for the "dedication" of equipment by common carriers, that does not imply that the type of dedication which Reynolds requires is consistent with the concept of common carriage such that protestant could provide the needed service. Even if protestant has authority to spot equipment at Reynolds's plant, it nevertheless has a duty as a common carrier to serve the public generally. *Utilities Commission v. Transport*, 260 N.C. 762, 133 S.E. 2d 692 (1963); *Utilities Comm. v. McCotter, Inc.*, 16 N.C. App. 475, 192 S.E. 2d 629 (1972); *affirmed*, 283 N.C. 104, 194 S.E. 2d 859 (1973). Thus, should any conflict arise between its duty to the public and its "dedication" of equipment to Reynolds, the former would prevail to the economic and competitive disadvantage of Reynolds. Further, in veiw of our determination that the Commission's findings of fact that Reynolds has a need for a carrier with statewide authority are supported by competent, material, and substantial evidence, the geographical restrictions on protestant's common carrier authority render it incapable of furnishing the required services. The facts of the present case distinguish it from *Utilities Comm. v. Petroleum Transportation, Inc.*, 2 N.C. App. 566, 163 S.E. 2d 526 (1968), in which this Court found insufficient evidence to support the Commission's finding that the shipper had a need for a specific service not otherwise available.

[2] As to the Commission's conclusion that the grant of contract carrier authority to applicant will not unreasonably impair the efficient public service of common carriers, protestant's only contention is that the grant of contract carrier authority to applicant will result in denying it the future opportunity to transport Reynolds's cans. A similar contention was rejected in *Utilities Comm. v. McCotter, Inc., supra,* in which this court stated.

It is true that protestant might reasonably expect to receive a portion of [the shipper's] business should contract carrier authority be denied to applicant. This fact alone, however, does not compel a determination that the efficient service of protestant as a common carrier will be unreasonably impaired. 'There is no public policy con-

demning competition as such in the field of public utilities; the public policy only condemns unfair or destructive competition.' *Utilities Comm. v. Coach Co.*, 261 N.C. 384, 389, 134 S.E. 2d 689, 694. Neither protestant, nor any other intrastate carrier, has handled any of the shipping which applicant will handle under the contract authority granted herein. Consequently, a continuation of applicant's operations under proper authority could hardly constitute unfair or destructive competition with respect to protestant or other carriers.

16 N.C. App. at 480-481, 192 S.E. 2d at 632-633.

The Commission, upon findings of fact fully supported by competent, material and substantial evidence in view of the record as a whole, concluded that applicant was entitled to the contract carrier authority sought. The Final Order appealed from is

Affirmed.

Judges MARTIN (Harry C.) and HILL concur.